**NATIONAL FOREST PRESERVATION GROUP, a Montana non-profit corporation, et al., Plaintiffs,**

v.

**John VOLPE, Individually and as Secretary of Transportation, F. C. Turner, Individually and as Federal Highway Administrator, Defendants.**

No. 2152.

United States District Court,
D. Montana,
Butte Division.

Dec. 11, 1972.

James H. Goetz, Bozeman, Mont., for plaintiffs.

Otis L. Packwood, U. S. Atty., Billings, Mont., Roy E. Murray, Jr., Asst. U. S. Atty., Butte, Mont., and Irwin L. Schroeder, Atty., Department of Justice, Washington, D. C., for defendants.

SUMMARY JUDGMENT

WILLIAM D. MURRAY, Senior District Judge.

This case is before the court on cross motions for summary judgment. The defendants have supported their motion with affidavits which have not been contradicted by the plaintiffs and there is no material fact upon which the parties disagree. Inasmuch as the plaintiffs have supplied memorandum which considers only two of the claims in the complaint, under Rule 7 of this court the defendants' motion to dismiss accompanied by memorandum must be considered as disposing of the other issues and the Second, Fourth and Fifth Claims are therefore dismissed.

This is an action to enjoin the construction of a federal-aid highway into the West Fork drainage of the Gallatin River in Madison and Gallatin Counties, Montana. The Montana State Highway Commission has requested and the request has been approved that the highway be designated as a primary highway under 23 U.S.C. § 103(b). The plaintiffs first contend that the preparation of the environmental impact statement (EIS), which is required by law to be prepared prior to construction of the highway, has been improperly delegated to the Montana highway administration (HA). Second the plaintiffs contend that the highway has been improperly designated a primary highway.

*I.   Preparation of the EIS*

In charging that the delegation of the EIS is improper the plaintiffs contend that the delegation is in violation of national environmental policy and that the

delegation is illegal. Neither contention has any merit for the EIS prepared by HA and adopted by the Federal Highway Administration (FHWA) fulfill all the purposes the EIS was intended to fulfill and provides the additional benefit of assistance through the local HA to the entire agency decision making process.

The directive that all Federal actions significantly affecting the quality of the human environment be accompanied by an EIS is found in 42 C.F.R. 4332 [Section 102(2)(C) of the National Environmental Protection Act (NEPA)]. The Council on Environmental Quality (CEQ) in its regulations has declared that "the objective of Section 102(2)(C) of the Act is to build into the agency decision making process an appropriate and careful consideration of the environmental aspects of proposed action and to assist agencies in implementing not only the letter, but the spirit of the Act." (CEQ Guidelines, 36 Fed.Reg. p 4724) (1971). The question under consideration here is whether or not delegating to the HA the responsibility of preparing the EIS is a violation of the letter or the spirit of the Act.

The FHWA has delegated responsibility for preparation of the EIS in Policy and Procedure Memorandum 90–1 (PPM 90–1) entitled "Environmental Impact and Related Statements" 37 Fed.Reg. 21809 (1972). Section 6(b) requires that "the draft environmental impact statement . . . shall be prepared and circulated by the HA in cooperation with FHWA during the location study." Section 102(2)(C) of the NEPA commands that the federal government shall "include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official." The plaintiffs here argue that PPM 90–1 is a violation of national environmental policy as expressed in *Guidelines*, supra, prepared by CEQ. In fact the *Guidelines* provide that the draft EIS need not be prepared by the responsible Federal Agency, but only that the Federal Agency take responsibility for the statement (Section 7, p. 4724).

The CEQ has reviewed and approved the procedure submitted to it by the Department of Transportation. On June 16, 1971, at the Hearings on Red Tape Before the Subcommittee on Investigations and Oversight on the House Committee on Public Works, 92nd Cong., 1st Sess., pp. 261–263, Chairman Train emphasized that the FHWA's procedures of having the draft statements prepared by the HA was in keeping with the purpose and spirit of both NEPA and the CEQ *Guidelines:*

"(The *Guidelines*) set general government wide policies and procedures but did not attempt to define for each agency how the act would affect its particular programs.

\*　　\*　　\*　　\*　　\*　　\*

The Federal Highway Administration has faced a more complex problem in dealing with the requirements of NEPA than the Corps of Engineers. As you know, the Corps itself largely plans and develops its own public works projects, whereas the FHWA operated through State Highway departments. The major role of planning, and constructing highways is played by State agencies, upon whom FHWA must rely for much of the information contained in Environmental statements."

Mr. Train concluded his remarks by voicing his belief that FHWA's procedure would lead to substantial improvements to the quality of the EIS on highway projects (p. 264). Under Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L. Ed.2d 616 (1964) an administrative agency's interpretation of its own regulations is entitled to great deference by the court.

More important Congress ratified with positive legislation the procedure requiring the HA to prepare the EIS.

Red Lion Broadcasting Company v. F. C. C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed. 2d 371 (1969). With knowledge that it was the intent of the Department of Transportation to utilize the local HA in preparing the EIS, on December 30, 1970, Congress passed 136(b) of the Federal-Aid Highway Act of 1970.[1] This section ordered the Secretary to submit to Congress guidelines designed to assure that possible adverse economic, social and environmental effects have been fully considered. 23 U.S.C. § 109. It is important to note that Congress implicitly approves of the known procedure as long as the instructions for consideration in the amendment are carried out.

▆ It is apparent that FHWA policy is not a violation of the CEQ *Guidelines* and it is also evident that that agency has given its approval to the procedure. But the plaintiffs charge that even so it is a violation of the law. Statutory interpretation necessitates that the intent of Congress is controlling in reading any statute, and that the plain and obvious meaning is the safest and most clearly expresses legislative intent. At the outset it should be pointed out that in making their declaration of national environmental policy Congress provided that it is the continuing policy of the federal government to "use all practical means and measures" to carry out the purposes of the Act. 42 U.S.C. § 4331.

The cases which have considered whether or not the agency may delegate its duty under the NEPA have discussed the function of the Act. Section 102 of NEPA mandates a particular sort of careful and informed decision making process and creates judicially enforceable duties. Calvert Cliffs' Coord. Com.

v. United States A. E. Com'n, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1115 (1971). The same court has held that "the word 'accompany' in Section 102(2)(C) must not be read so narrowly as to make the Act ludicrous. It must, rather, be read to indicate a congressional intent that environmental factors, as compiled in the 'detailed statement,' be considered through agency review processes." Calvert Cliffs', supra, 1117, 1118. The court goes on to say:

"Beyond Section 102(2)(C), NEPA requires that agencies consider the environmental impact of their actions 'to the fullest extent possible.' . . . Compliance to the *'fullest'* possible extent would seem to demand that environmental issues be considered at every important stage in the decision making process concerning a particular action—at every stage where an overall balancing of environmental and nonenvironmental factors is appropriate and where alterations might be made in the proposed action to minimize environmental costs." p. 1118.

Preparation by the HA does not prevent this type of consideration. There is no allegation that the report is not available at every important stage of the decision making process or that the report is not prepared pursuant to the mandate in the statutes and the regulations of the Council on Environmental Quality, except that it has not been prepared by the FHWA itself. But the parties seeking administrative action are the most obvious and important source of information and expertise. "Although the agency has the duty to develop a record justifying its decisions, much of the burden of producing the relevant studies and reports is rightfully shifted to the appli-

[1]. On August 25, 1970, before the Subcommittee on Roads of the Senate the committee on Public Works (91st Cong. 2nd Sess.) the Federal Highway Administration testified that the HA would be required to prepare the draft EIS ; CEQ issued interim guidelines, 35 Fed.Reg. 7390 (May 15, 1970) which emphasized that State and local governments are to be drawn into the decision-making process ; Department of Transportation Order 5610, October 7, 1970, provides that each application for a grant will be required to submit a draft 102(2)(C) statement.

cant." 24 Rutgers L.Rev. 230, 258 (1970).

■ PPM 90–1 requires that a representative of the FHWA division office shall indicate his review and adoption of the draft environmental statement by signing and dating before it is released for comment. At least one court has indicated that there is a danger in allowing an interested party to prepare the EIS which is utilized in the agency process. Greene County Planning Board v. Federal Power Com'n, 455 F.2d 412, 420 (2 Cir., 1972). Affirmed 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). The *Greene* case recognized the value to the court of the interpretation of CEQ as to the purpose of the NEPA and then appears to contradict that interpretation. The case states:

> "Although the Guidelines are merely advisory and the Council on Environmental Quality has no authority to prescribe regulations governing compliance with NEPA, we would not lightly suggest that the Council, entrusted with the responsibility of developing and recommending national policies 'to foster and promote the improvement of the environmental quality,' NEPA § 204, 42 U.S.C.A. § 4344, has misconstrued NEPA. Although the Commission's interpretation of Section 10(e) of the Guidelines is superficially appealing, it flies in the face of Section 102(2)(C) of NEPA which explicitly requires the agency's *own* detailed statement to 'accompany the proposal through the existing agency review processes.'" p. 421.

However, consistent with this statement Section 102(2)(C) simply requires "a detailed statement by the responsible official," and thus preparation need not be by the agency itself. The only thing preventing the Federal agency from adopting the applicant's statement in the *Greene* case is that the court finds the "potential, if not likelihood, that the applicant's statement will be based upon self-serving assumptions." *Greene*, supra, 420. The statutory authority for the construction of Federal-aid highways requires cooperation and heavy reliance between the FHWA and the state HA. 23 U.S.C. § 101 et seq. There is no indication in this case that the EIS prepared by the HA is self-serving. It should not be presumed that states are not concerned with the environmental problems facing us all. After concluding that a road of some kind will exist whether or not federal aid is available the EIS states: "It would be more harmful to the environment to have traffic using a substandard roadway than to have a highway built to modern standards with proper provision made for drainage and erosion control." Inasmuch as Section 102(2)(C) does not explicitly require that a federal official prepare the EIS this court cannot find as a matter of law that preparation of the EIS by the HA is a violation of the spirit or the mandate of the NEPA.

A primary purpose of the EIS is to provide "a single coherent and comprehensive environmental analysis, which is itself subject to scrutiny during the agency review processes." *Greene*, supra, 420–421. The need for this type of analysis is emphasized by expanded capacity to sue which results in intervenors with limited resources. The fact that the HA prepares the EIS does not mean that the agency is merely standing passively by as a referee in the struggle between the adversaries appearing before it. PPM 90–1 provides standards which insure that "a systematic, interdisciplinary approach" is utilized and that the HA "study, develop and describe" appropriate alternatives to recommended courses of action. Further, the draft and the final EIS are both subject to the agency review process. This procedure is clearly within the spirit of the NEPA and has been developed using "all practical means and measures" to protect the environment.

*II.  Designation as a Primary Highway*

Plaintiff has argued in count one of the complaint and on motion for summary judgment that the proposed Lone

Mountain Access Road has been improperly designated a primary route of the Federal aid systems under 23 U.S.C. § 103. The primary system is to consist of an "adequate system of connected main highways." The initial determination as to which highways will carry this classification is made by the state highway department subject to the approval of the Secretary of Transportation. 23 U.S.C. § 103.

■ When any state decides to avail itself of the benefits of federal aid for highways it does so by initiating a request through its highway department. 23 U.S.C. § 103, 23 C.F.R. 1.6. There is a great deal of flexibility allowed in making a determination as to whether or not a highway can be appropriately designated a Federal-aid highway. The criteria is set out in 23 C.F.R. 1.6(c).

> "(c) *Selection considerations.* Each Federal-aid system shall be so selected or designated as to promote the general welfare and the national and civil defense and to become the pattern for a long-range program of highway development to serve the major classes of highway traffic broadly identified as (1) interstate or interregional; (2) city-to-city primary, either interstate or intrastate; (3) rural secondary or farm-to-market; and (4) intraurban. The conservation and. development of natural resources, the advancement of economic and social values, and the promotion of desirable land utilization, as well as the existing and potential highway traffic and other pertinent criteria are to be considered when selecting highways to be added to a Federal-aid system or when proposing revisions of a previously approved Federal-aid system.

> (d) *Identity.* The Federal-aid highway systems as now constituted and approved are identified as:

> "(2) The Federal-aid primary system, as described in 23 U.S.C. 103(b),

comprised of important city-to-city, interstate and intrastate highways, serving essentially through traffic."[2]

Even though responsibility under this title has been transferred from the Secretary of Commerce to the Secretary of Transportation it appears that FHWA is utilizing an unpublished Department of Commerce Policy and Procedure Memorandum 10-1 (PPM 10-1) for guidelines to the policies and procedures relating to designation of Federal-aid highway systems. PPM 10-1 requires that each proposal contain adequate supporting information.

Attached to the motion for the summary judgment is an affidavit by Harold N. Stewart, Division Engineer for the Montana Division of the FHWA. In this affidavit Mr. Stewart sets out the considerations used to establish the Lone Mountain Access Road as a Federal-aid primary highway. The predominant factor and key-stone to the designation was anticipated development and completion of a multimillion dollar recreational complex in the West Fork drainage of the Gallatin River by Big Sky of Montana, Incorporated and the Chrysler Realty Corporation. The report states that *"if completed* as now planned, the Big Sky development would be comprised of a lower Meadow Village including a golf course, tennis courts, bridle paths, shops and stores, condominiums and an upper Mountain Village, including ski slopes and lifts and necessary commercial facilities, convention centers, lodges, etc." (Emphasis added.) As a result of this development "future traffic volumes for the year 1980 were estimated to be 1380 vehicles per day on the upper 6.7 miles of this proposed primary highway with even larger volumes on the lower 3 miles . . . The spur would carry more traffic to and from Big Sky than most existing primary routes in Montana now operating . . It would be connected to a Federal-aid primary highway (U.S. 191) . . .

2. This regulation does not reflect the 1970 Amendment to 23 U.S.C. § 103 which added the urban system to the Federal-aid systems.

and the traffic on the spur would be predominately city to Big Sky area primary traffic." Thus it is argued, under the Federal-Aid Highways Act, 23 U.S. C. § 101 et seq. and accompanying regulations that the spur was appropriate for primary designation.

The complaint alleges "that the road would not serve essentially through traffic, that it would not be a connecting main highway, and therefore the primary designation was in violation of statutory authority. By way of reply, accompanying the defendants' summary judgment, is an affidavit by which the affiant FHWA official, J. Paul Bowker, intends to demonstrate that the Federal Highway Administration has in the normal course of administration interpreted Section 103(b) as permitting system approval for spur routes. The affidavit lists some 24 places where spur and stub routes which serve recreational, resort and scenic areas have been constructed. The United States has argued that under *Tallman*, supra, this administrative interpretation is entitled to deference by the court. The rule in *Tallman* does not support this conclusion. As stated above *Tallman* requires deference to longstanding administrative interpretation of their own regulation. In this case the Secretary of Transportation is interpreting the statute, 23 U.S.C. § 103(b), as permitting systems approval for spur routes. Even so, the Secretary's interpretation that spur routes are justified under the statutes is not questioned. The objection is that this particular route has been selected as a Federal-aid primary highway.

Primary highways are described in § 103 as "connected main highways." 23 C.F.R. 1.6 describes them as "important city-to-city interstate and intrastate highways, serving essentially through traffic." A city to intrastate highway spur is obviously justified under the concept of connecting main highways. The problem is that Big Sky is not yet a city, a town or even a small community. As of the date of the hearings on this proposed road no permanent resident lived at its end. What then does it connect? It connects a yet to be completed recreational resort area with potential investors and/or customers and therefore does not fall within the statutory language. Since the project does not fit into the meager description of what constitutes a primary highway, we must next ask is the expenditure justified under the discretion given the Secretary to promote the purposes of the Act?

The policy statement in § 10 expresses concern for local and interstate commerce for the national and civil defense. A fair reading of the statutory authority must conclude that the Act was intended to promote public welfare, interstate commerce and national defense. In order to determine whether or not the construction of the spur will promote these policies it is necessary to consider some of the factors which surround the spur's designation as a primary highway.

In his affidavit Mr. Stewart states that the West Fork Drainage Area was declared an economic growth center on March 9, 1972, and thereby becomes eligible for a total of 86% federal participation in the cost of building the spur into the area. Although the complaint alleges that the designation was inappropriate, plaintiffs have failed to support this allegation by memorandum or affidavit and therefore there is no need to question it here. Attached to the defendants' motion for summary judgment is a memorandum by the FHWA which attempts to set out the rationale for declaring the West Fork an economic growth area. The following quote from that memorandum points out the importance of the highway to the success of Big Sky which is, as stated above, the key-stone to area development. The memorandum states: "Without the construction of this highway the Big Sky Complex would be hindered in its development as existing transportation facilities are completely inadequate."

It appears that while the whole 9.7 miles from U.S. 191 to Lone Mountain have been designated as primary high-

way federal participation has been requested for only the upper 6.7 miles. Mr. Stewart states that it is his information and belief that Big Sky, Inc., has supplied virtually all the funds used to construct the first 3 miles. There are insufficient facts to determine why federal funds are available for the upper 6.-7 miles but not available for the first three which it is estimated will carry the highest volume of traffic.

Since the designation was the result of the projected success of the area development then the justification for the highway expenditure depends upon the success of the business venture it serves. This is not a highway to a defense plant or to a community of individual home-owners and entrepreneurs engaged in community development. This is a highway into a speculative venture in the development of a recreational community.

 Expenditures for Federal-aid highways are justified in order to promote national defense, interstate commerce and the general welfare. The Big Sky Complex has no defense purpose. It is an undertaking which contemplates risk in return for large return as the result of rising land values on developed recreational property. The benefits to interstate commerce and the general welfare accrue only after the complex has become a success for its promoters. It is true that construction of the project will have some economic effect upon surrounding areas in terms of providing jobs to those able to participate in the development, but "until completed" the immediate and most significant effect of the construction of the road will be to provide an aid to the corporations developing the area. Government spending is at an all time high and often government provides aids to private industry but those expenditures are justified by overriding concern for important social interests which are the prime target of the expenditure. Moreover, projects of this type are authorized by specific legislation. There is no rationale for the expenditure of federal funds which serve to benefit directly this type of private

business venture without explicit congressional authorization. To allow the primary highway designation to stand would have the effect of holding that the FHWA may become a partner in private enterprise without explicit statutory authority.

Therefore, for the above reasons, this court declares that the designation of Lone Mountain Access Road as a Federal-aid primary highway exceeds the statutory authority of the defendants and further that the acts of defendants in proceeding with the funding and construction of the Lone Mountain Access Road exceeds the statutory authority of defendants. The request for a declaration that the delegation of the environmental impact statement to the highway administration exceeds statutory authority is denied.

Therefore, it is ordered and this does order that the defendants are hereby enjoined from proceeding with the funding and construction of the Lone Mountain Access Road under 23 U.S.C. § 103(b).