**IOWA CITIZENS FOR ENVIRONMENT-
AL QUALITY, INC., et al.,
Appellants,**

v.

**John A. VOLPE, as Secretary of Transportation, et al., Appellees.**

**No. 73–1062.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 11, 1973.

Decided Nov. 26, 1973.

Robert B. Scism, Des Moines, for appellants.

Lawrence E. Shearer, Atty., Dept. of Justice, Washington, D. C., for appellees.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and ROSS, Circuit Judges.

VAN OOSTERHOUT, Senior Circuit Judge.

This is a timely appeal by plaintiffs, an Iowa environmental organization, and eighteen individuals, from final order of the District Court dismissing their complaint seeking injunctive relief against the construction of a 21.4 mile diagonal segment of Interstate Highway I–35, designated by the Federal Highway Administration as I–35–6.[1]

Defendants are the Secretary of Transportation, officials of the Federal Highway Administration (FHWA) and officers of the Iowa State Highway Commission (ISHC). The major part of the cost of I–35–6 is provided by the federal government through FHWA.

This case was tried to Judge Stuart. Many facts were stipulated; evidence was received. Judge Stuart filed a well-reasoned memorandum opinion on November 30, 1972, reported at 3 E.L.R. 20013, which sets out the applicable law and incorporates detailed findings of fact and conclusions of law upon which the dismissal of the complaint is based.

It is undisputed that the provisions of the National Environmental Policy Act

---

1. I–35–6 refers to the entire 27.4 mile segment of I–35 not yet constructed or under construction. For the sake of convenience herein, we will utilize I–35–6 as the 21.4 mile diagonal alignment portion. "Diagonal segment" refers to the fact that the highway will diagonally sever the survey units of this area of Iowa.

(NEPA), 42 U.S.C. § 4321 et seq., apply to the I–35–6 project here involved. Two basic issues are raised upon this appeal, to wit: (1) Whether the Environmental Impact Statement (EIS) filed in connection with the completion of the I–35–6 project complies with NEPA; (2) whether the preparation of the EIS by ISHC at the request of the responsible federal agencies, which the latter reviews, modifies and adopts, complies with the requirements of NEPA.

Substantially the same issues were presented to the trial court and were answered in the affirmative. We agree and affirm.

The standard of review in cases concerning NEPA is succinctly set forth in Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289, 300 (8th Cir. 1972):

> Where NEPA is involved, the reviewing court must first determine if the agency reached its decision after a full, good faith consideration and balancing of environmental factors. The court must then determine, according to the standards set forth in §§ 101(b) and 102(1) of the Act, whether "the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values." Calvert Cliffs' Coordinating Committee v. AEC, [146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971)].

In addition, "[t]he court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

*Adequacy of the Final Environmental Impact Statement.*

Section 102(C) of NEPA requires the responsible federal agency to "[i]nclude in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official" on the impact of the action on the environment, including alternatives to the proposed action. Section 102(D) requires the agency to "study, develop and describe appropriate alternatives" to the proposed action. Plaintiffs here claim the statement filed for the completion of Interstate 35 fails to satisfy the requirements of Section 102 in that it does not state in sufficient detail any alternatives to the project in question, nor does it show that appropriate alternatives were ever studied, developed, and described. Plaintiffs also assert that the statement does not reflect a good-faith balancing of environmental factors in that it fails to discuss particular environmental considerations in sufficient detail.

It is well established that NEPA is an "environmental full disclosure law," such that administrative agencies of the federal government must develop and consider all the environmental consequences of their decisions. Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289, 294–295 (8th Cir. 1972). The environmental impact statement required by NEPA is to serve as a basis for consideration of environmental factors by the agency involved and is to provide a basis for critical evaluation by those not associated with the agency. Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 350–351 (8th Cir. 1972); Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289, 297–299 (8th Cir. 1972); Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971). Thus, all federal agencies are to use the environmental impact statement in conducting a process of good-faith balancing of the important environmental factors which apply to any agency action. In short, the policies of NEPA enunciated in Section 101 must be considered and implemented in the policies, regulations, and public laws of the United States "to the fullest extent possible" through the procedural requirements of Section 102(2). Environmental Defense

Fund, Inc. v. Corps of Engineers, 470 F.2d 289, 296–297 (8th Cir. 1972); Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114–1115 (1971).

However, strict though the procedural requirements of Section 102(2) may be, they must be interpreted on a basis of reasonableness. Environmental Defense Fund, Inc., v. Corps of Engineers, 470 F.2d 289, 297 (8th Cir. 1972). " * * * [I]f this requirement is not rubber, neither is it iron. The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite." Natural Resources Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 837 (1972). See Environmental Defense Fund, Inc. v. Corps of Engineers, 348 F.Supp. 916, 933 (N.D.Miss. 1972); Environmental Defense Fund, Inc. v. Corps of Engineers, 342 F.Supp. 1211, 1217 (E.D.Ark.1972).

As Judge Stuart noted, the environmental statement "to some extent must be examined in light of the particular facts and circumstances surrounding the project * * * in order to determine its sufficiency. The extent of detail required must necessarily be related to the complexity of the environmental problems created by the project." The discussion of environmental effects need not be "exhaustive" but rather need only provide sufficient information for a "reasoned choice of alternatives." Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972). See Sierra Club v. Froehlke, 345 F.Supp. 440, 444 (W.D. Wis.1972), where the court stated that Section 102(2) does not require that "each problem be documented from every angle to explore its every potential for good or ill."

In the instant case the environmental consequences of the reasonable alternatives would not greatly differ. Judge Stuart succinctly described the factual situation:

At the time the EIS was being prepared for project I–35–6 the northern and southern termini for the project had been fixed by the construction of other segments of I–35. In Iowa only this 27.4 mile segment of I–35 had not been completed. The northern terminus is about 11 miles east of the southern terminus. The area involved in any route between these two points is essentially the same tillable farmground. The impact on the natural environment would not differ greatly regardless of which particular route was selected. On the route selected only five families are being displaced. It does not affect any historical, archeological, geological, natural or recreational features or man made structures of any consequence, other than the five homesteads previously mentioned. The greatest environmental impact will be the adverse effect on the farming operations caused by diagonal severance, the straightening of the Iowa River for less than one-half mile and the effect of the construction of a four lane limited access divided highway across tillable farmland.

In such a situation the detail required in an environmental impact statement would not match that which would be required if the various possible alternatives differently affected any historical, geological, or natural features. The placing of a highway across tillable farmland with no particular features of environmental interest or concern does not require the exhaustive analysis which would be required if significant differences in environmental impact among alternatives were present. "Where the environmental aspects of alternatives are readily identifiable by the agency, it is reasonable to state them— for ready reference by those concerned with the consequences of the decision and its alternatives." Natural Resources Defense Council, Inc. v. Morton, 148 U.S. App.D.C. 5, 458 F.2d 827, 837 (1972).

In the instant case, the possible alternatives were found to be extremely limited. The project is a matter of closing a gap in a major interstate highway across tillable farmland. As Judge Stuart noted, the alternative of doing nothing need not have been exhaustively detailed in light of the obvious disadvantages of that alternative. The public interest in completing the small gap is clearly established. The other alternatives thus involved particular routings to fill the gap, diagonal or otherwise. The court found that the alternative of building the connecting link in straight lines with two right angle turns would require 7.6 miles more highway over similar land and thus take out of production substantially more land than would the proposed project. The environmental consequences would not differ to any significant extent, and the environmental impact statement thus was not required to be as exhaustive as otherwise.

■■ Judge Stuart found the environmental impact statement, in light of these particular circumstances, to be sufficient to put interested persons on notice of the significant impacts of this project on the environment. A reasonable interpretation of Section 102 should indicate that finding to be correct; notice of environmental consequences is all that is required. *See* id.; Sierra Club v. Froehlke, 345 F.Supp. 440, 444 (W.D. Wis.1972); Conservation Council of North Carolina v. Froehlke, 340 F.Supp. 222, 227–228 (D.N.C.1972). "The question to be asked is whether all reasonable alternatives to the project have been considered, even if some were only briefly alluded to or mentioned." Environmental Defense Fund, Inc. v. Armstrong, 352 F.Supp. 50, 57 (N.D.Cal. 1972). The environmental impact statement in this case, while somewhat brief, fulfilled these requirements as to this project. We agree with the trial court that the EIS statement met any EPA requirements under the facts presented by the record.

*Preparation of the Environmental Impact Statement by the State Highway Commission.*

■ The plaintiffs' second contention on appeal is that the federal agency responsible for the major federal action at issue may not delegate to a state agency the duty of preparing the environmental impact statement required by Section 102(2)(C) of NEPA. Plaintiffs rely principally on Greene County Planning Board v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972). In that case the responsible federal regulatory agency was held to have abdicated a significant part of its responsibility under the Act by substituting the statement of an applicant for a permit. The Second Circuit cited the potential or likelihood that the applicant's statement would be based on "self-serving assumptions." *Id.* at 420. Thus, if the federal agency should adopt the applicant's statement, this would negate the strict consideration of environmental values required by the federal agency in Section 102(2) of the Act. The Second Circuit thus held that though the applicant could prepare the draft statement, the final environmental impact statement must be prepared by the FPC itself as a requirement of the statute. *Id.* at 420–422.

Several cases since *Greene County* have adopted its reasoning as to highways and other federally approved or funded projects. *See* Conservation Society of Southern Vermont, Inc. v. Secretary, 362 F.Supp. 627, 631 (D.Vt.1973) ("comments * * * were merely perfunctory, the equivalent of an agency rubber stamp"); Citizens for Clean Air, Inc. v. Corps of Engineers, 349 F.Supp. 696, 707 (S.D.N.Y.1972) ("perfunctory listing of other agencies' conclusions"); Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 741 (D.Conn.1972). Support for the extension of *Greene County* to federal-aid highway construction has been voiced. *See* Comment, The Preparation of Environmental Impact Statements by State Highway Commissions, 58 Iowa L.Rev. 1268 (1973).

Several courts, however, have refused to apply *Greene County* to the construction of federal-aid highways and other federally-aided or sponsored projects. The delegation of the preparation of an environmental impact statement by the responsible federal agency to a state highway agency, albeit for construction of an airport runway, was specifically allowed in Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973). The Ninth Circuit indicated that such delegation was quite proper because of the "significant and active" participation of the responsible federal agency in the preparation of the impact statement. Slip opinion at 11. *Greene County* and *Conservation Society of Southern Vermont* were thus specifically distinguished. The Ninth Circuit had earlier impliedly approved the delegation of the preparation of an environmental impact statement in Lathan v. Volpe, 455 F.2d 1111, 1122 (9th Cir. 1972).

Several district court decisions have upheld delegations of preparation of environmental impact statements. In National Forest Preservation Group v. Volpe, 352 F.Supp. 123, 127 (D.Mont. 1972), preparation "by the agency itself" was held not to be necessary. Rather, the court indicated that the standards in the regulations insure that environmental consequences and alternatives are offered by the state agency for federal consideration. In addition, review of the environmental impact statement by the federal agency was held to be "clearly within the spirit of NEPA." *Id.* Again, *Greene County* was specifically distinguished because of the federal agency participation. In Finish Allatoona's Interstate Right, Inc. (FAIR) v. Volpe, 355 F.Supp. 933, 938 (N.D.Ga. 1973), preparation of a statement by the Georgia State Highway Department "in consultation" with state, local and federal agencies was approved. "The record

is clear that the Secretary [of Transportation] did not merely rubber stamp the State's work, but rather reviewed, approved, and adopted the statement, thus making it his own. It is this Court's opinion that such a procedure is in harmony with the purposes of the statutory requirements and goals of NEPA." *Id. See also* The Citizens Environmental Council v. Volpe, 364 F.Supp. 286 (D. Kan., 1973), aff'd, 484 F.2d 870 (10th Cir. 1973); Northside Tenants' Rights Coalition v. Volpe, No. 72–C–300, 3 E.L. R. 20154 (E.D.Wis., Jan. 17, 1973); *cf.* Citizens for Mass Transit Against Freeways v. Brinegar, 357 F.Supp. 1269, 1277 (D.Ariz.1973).

The district court, upon the basis of substantial evidence, specifically found that the FHWA recommended changes in the initial statement and provided additional information to be added to the final statement. Review, modification and adoption by the FHWA of the statement as its own occurred in this case. Such extensive participation by the responsible federal agency would clearly distinguish this case from *Greene County*. In our present case, the federal agency did not "abdicate a significant part of its responsibility" to the state highway commission by "rubber stamping" or adopting an unaltered or incompletely reviewed environmental impact statement. *See Life of the Land, supra,* 485 F.2d at 468.

Section 102(2)(C) of NEPA requires a detailed statement of the environmental impact of a federal project by the responsible federal official. It does not specifically state how such official shall obtain the information upon which his statement is based. Since the enactment of NEPA, FHWA with the acquiescence of the Council on Environmental Quality,[2] and the knowledge of Congress,[3] has consistently interpreted

---

2. The Council on Environmental Quality was apprised of and approved of this procedure since the entirety of PPM–90–1 was published in its official publication, 102 Monitor, Vol. I, No. 9, Oct. 1971, and specifically recognized at Vol. I, No. 10.

3. On June 16, 1971, Russell Train, Chairman of the Council on Environmental Quality, testified before the House Subcommittee on Investigation and Oversight and fully apprised this Subcommittee of FHWA's procedure of relying on state agencies for much

the provisions of NEPA as permitting the delegation of the physical act of gathering the information necessary for the preparation of Section 102(2)(C) EIS to the state highway departments recommending the proposed federal-aid highways.

■ Department of Transportation PPM 90-1, promulgated August 24, 1971, at § 6 provides that the preliminary EIS shall be prepared by the sponsoring state agency, that it be approved by the FHWA, and that it be circulated to appropriate interested agencies for comment, and that later the final EIS, including copies of all comments received, shall be forwarded to FHWA and that FHWA shall review the statement, modify it as necessary and when appropriate, adopt it as its own. It is well established that an administrative interpretation of a statute by the agency charged with its enforcement is entitled to great deference. Griggs v. Duke Power Co., 401 U.S. 424, 433-434, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971); United States v. City of Chicago, 400 U.S. 8, 10, 91 S.Ct. 18, 27 L.Ed.2d 9 (1970); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

The decision of the trial court is in all respects supported by substantial evidence and is not induced by any erroneous view of the applicable law. The trial court's well-considered opinion supports the judgment of dismissal.

Affirmed.

LAY, Circuit Judge (dissenting).

I respectfully dissent.

This court's approval of the FHWA's delegation of the preparation of a preliminary environmental impact statement (EIS) to the sponsoring state agency not only violates the spirit and purpose of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., but the Congressional command as well. As the majority decision acknowledges, the Department of Transportation's regulations now provide that the preliminary EIS is to be prepared by the sponsoring state agency, and it is to be approved or disapproved by the FHWA and *then* circulated to appropriate interested agencies for comment; thereafter, the final EIS with all comments is to be *reviewed* by the FHWA, which will modify it as necessary or when appropriate adopt it as its own. Although administrative interpretation of a statute is entitled to great deference, the ultimate question as to whether an agency procedure violates NEPA is one of law and must be resolved by this court. The agency cannot be its own self-arbiter of whether it exceeds its delegated power. *See, e. g.,* Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 90 L.Ed. 718 (1946); United States v. New England Coal & Coke Co., 318 F.2d 138, 143 (1st Cir. 1963); *cf.* Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.Conn. 1972).

Section 102(2)(C) of NEPA, 42 U.S. C. § 4332(2)(C), specifically provides that a detailed EIS must be prepared by *"the responsible Federal official"* and that *this* statement "shall accompany the proposal through the existing agency review processes." I fail to see how this explicit language of NEPA can be read to mean that information-gathering and preparation of the statement may be delegated to a state agency with a vital interest in the outcome of the investigation. NEPA does not set up the responsible federal agency as a review board of the contemplated state action, simply making suggestions here, modifying there, with the idea of either giving ultimate approval or rejection to the plan. On the contrary, the Act is explicit that it is the federal agency concerned with

of the information contained in environmental impact statements. Hearings on Red Tape Before the Subcommittee on Investigations and Oversight of the House Committee on Public Works, 92d Cong., 1st sess., pp. 261–263.

See also Hearings Before the Subcommittee on Roads of the Senate Committee on Public Works, 91st Cong., 1st sess., p. 7 (August 25, 1970).

major federal action which must prepare the environmental impact study and develop alternatives to the proposed action.

The majority's construction of the Act is in derogation of the statutory scheme. NEPA requires that *prior* to preparing an EIS, the responsible federal official consult with and obtain comments from any federal agency "which has jurisdiction by law or special expertise with respect to any environmental impact involved." Thereafter, the responsible federal officer is to take the preliminary EIS, along with the comments and views of "Federal, State and local agencies," and submit these combined views "through the existing agency review processes."

This express statutory procedure thus contemplates a preliminary EIS by the responsible federal official to be submitted *along with* the state agency's comments and views. This is a far cry from simply reviewing a state highway department's study. It requires affirmative and initial federal action. As has

been recognized, there exists a fundamental difference between the responsibility for fact-gathering and making an independent objective appraisal of environmental impact as opposed to reviewing the self-serving declarations of a biased study by a state agency. Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 420 (2d Cir. 1972); Comment, The Preparation of Environmental Impact Statements by State Highway Commissions, 58 Iowa L. Rev. 1268, 1270 (1973).[1] Despite this difference, the majority opinion finds that there was substantial compliance with NEPA since the FHWA did not merely "rubber stamp" the state report but in fact required additional information to be added to the final statement. This overlooks the necessity and importance of federal preparation of the EIS *early* in the decisionmaking process. There exists no real prophylactic, late in the game, to overcome the possibility of a state's biased presentation of environmental factors.

---

[1]. In a thorough note in the Iowa Law Review, the author points up the deficiencies in the delegation procedure:

First, he writes:

Available evidence, including testimony by the prior Secretary of Transportation, John Volpe, indicates that state highway commissions do not affirmatively seek a neutral and unbiased judgment of the environmental aspects of a proposed project. These bodies tend to view environmental impact statements as mere procedural paperwork which will justify prior decisions made on the basis of traditional engineering and cost-analysis concepts.

Second, he observes:

[T]he Iowa Highway Commission's concession of its inability to plan alternate transportation modes highlights one of the primary reasons why it is impossible for the Commission to issue an impact statement fully complying with NEPA. It is unrealistic to surmise that other means of transportation will be given an equitable evaluation by an agency which has no authority, experience, or expertise in any transportation system except highways.

And finally, it is said:

A final problem with preparation of impact statements by highway commissions is their

bias towards freeways and expressways. For example, in Iowa, many primary roads are in extremely poor condition. Yet, the Iowa Highway Commission continues to spend the majority of its construction budget for freeways and expressways. The Freeway 518–4 impact statement does not even mention the feasibility of constructing a new modern two-lane primary road or reconstructing the existing road. The only alternatives presented are different routes for the freeway. This preference for freeways and expressways continues unabated despite a recent Iowa Poll indicating that the overwhelming majority of Iowans oppose expending more money on freeways and expressways than on primary roads. Additionally, freeways and expressways have been under attack in numerous locations throughout Iowa. Nonetheless, in its Freeway 518–4 impact statement, the Iowa Highway Commission blandly asserts that the needs of the traveling public are best served by a freeway-expressway system.

Comment, The Preparation of Environmental Impact Statements by State Highway Commissions, 58 Iowa L.Rev. 1268, 1278–1280 (1973).

In *Greene County, supra* at 420, this problem was exposed by Judge Kaufman, who observed:

> The Federal Power Commission has abdicated a significant part of its responsibility by substituting the statement of PASNY for its own. The Commission appears to be content to collate the comments of other federal agencies, its own staff and the intervenors and once again to act as an umpire. *The danger of this procedure, and one obvious shortcoming, is the potential, if not likelihood, that the applicant's statement will be based upon self-serving assumptions.*
> * * *

Moreover, although decisions like *Scenic Hudson I* have greatly expanded the concept of standing to challenge administrative action, *intervenors generally have limited resources, both in terms of money and technical expertise, and thus may not be able to provide an effective analysis of environmental factors.* It was in part for this reason that Congress has compelled agencies to seek the aid of all available expertise and formulate their own position early in the review process. (emphasis added).

Moreover, the Second Circuit emphasized the need for the federal agency to formulate its own EIS *early* in the agency review process. Otherwise, "alternatives might be lost as the applicant's statement tended to produce a *status quo* syndrome." *Greene County, supra* at 421.

Circuit Judge Oakes, sitting by special assignment on the district court in Vermont, faced the identical issue before us. He rejected any attempt to circumvent initial federal responsibility in Conservation Society of Southern Vermont, Inc. v. Secretary, 362 F.Supp. 627 (D. Vt.1973). He observed:

> In Vermont, at least, the Vermont Highway Department has the duty, as testified to by Speaker of the House Kennedy and by Commissioner of Highways Gray, to follow legislative mandate in regard to proposed highway construction, and the construction here contemplated was legislatively mandated in 1968. Thus, it is impossible for the Vermont Highway Department not to be an advocate of legislatively mandated construction and still act consistently with its duty as a state agency. This being true, delegation of the preparation of an EIS to the VHD raises the danger that the EIS will reflect "self-serving assumptions" and brings the case directly within *Greene County.*
> * * * * * *
> It is true that the VHD will receive in the ordinary course of events primary system money for Vermont highways whether the particular highway here proposed is built or not but this is immaterial; the VHD will want to see that money spent where the Vermont legislature wants it spent, and to that extent the VHD is necessarily an advocate of the particular project.

*Id.* at 631.

Judge Kaufman, in *Greene County, supra* at 419, of 455 F.2d, quoting from Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608, 620 (2 Cir. 1965), cert. denied sub nom., Consolidated Edison Co. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), aptly described the role of the federal agency under NEPA:

> In this case, as in many others, the Commission has claimed to be the representative of the public interest. This role does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission.

The purpose and spirit of NEPA in requiring an EIS on all major federal proposals commands a qualitative objective evaluation of any adverse environmental effects the plan may have. Such a study requires an independent investi-

gation, free from the biased views of an interested party. If Congress had intended the federal agency to sit as a board of review it could have simply said so. It did not. It made clear that the federal agency has an affirmative obligation to make a detailed investigation and study. This cannot be accomplished by a hindsight review of facts gathered by an interested party.

I would reverse and require the FHWA to independently investigate and prepare its own detailed EIS in conformity with the requirements of NEPA.