Larry VENTLING and Linda Ventling, Plaintiffs,

and

National Wildlife Federation and South Dakota Wildlife Federation, Plaintiffs-Intervenors,

v.

Bob BERGLAND, etc., et al., Defendants,

and

Edward Hines Lumber Company, Defendant-Intervenor.

No. Civ 79–5036.

United States District Court, D. South Dakota, W. D.

Sept. 12, 1979.

Brian D. Hagg, of Whiting & Hagg, and Jack T. Klauck, Rapid City, S.D., for plaintiffs.

Robert J. Golten, Boulder, Colo., for plaintiffs-intervenors.

Shelley M. Stump, Asst. U.S. Atty., Rapid City, S.D., and Charles B. Lennahan, Denver, Colo., for defendants.

Wayne F. Gilbert, of Gunderson, Farrar, Aldrich, Warder & DeMersseman, Rapid City, S.D., for defendant-intervenor.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

The plaintiffs in this case are seeking to enjoin the construction of roads, as part of a timber sale contract, in an area of the Black Hills National Forest known as Hay Draw. The plaintiffs are tenants of an inholding (private land surrounded by National Forest) within the Hay Draw area. Plaintiff-intervenors are private conservation organizations. The defendants are federal officials charged with the management of the Black Hills National Forest. Defendant-intervenor is the lumber company holding the timber sales contract for the Hay Draw area.

## FACTUAL BACKGROUND

The Black Hills National Forest is an area of approximately 1,224,600 acres within Western South Dakota and Eastern Wyoming. The Forest is a relatively homogeneous geographic and geological area. Ponderosa pine is the predominant tree species in the Forest, and logging this species has been an important activity in the area for almost one hundred years. The history of federal management is nearly as long-standing; the first government timber sale in the nation took place within the Forest in 1898. Through the years logging has resulted in the development of travelways up most of the draws and canyons within the Forest.

On March 18, 1977, the Forest Service published a final Environmental Impact Statement (EIS) in conjunction with a Timber Management Plan for the Black Hills National Forest. The Plan is intended to provide direction for administrative actions until 1986. The concomitant EIS is therefore of the "programmatic" variety required when a series of actions will have a cumulative or synergistic environmental impact. As part of the preparation of the EIS the Forest Service investigated and examined the use of existing roads throughout the entire Forest. In certain areas the roads were found to be adequate. In other areas, including Hay Draw, the roads were found to be inadequate for management purposes under the Multiple Use Sustained Yield Act of 1960. 16 U.S.C. section 528 *et seq.* Specifically, many of the roads were determined to be too narrow and highly susceptible to poor drainage, leading to soil erosion. The fact that many of the roads ran through draws meant that they were

not "buffered" by vegetative cover necessary for proper wildlife management. Some of the roads, and the system as a whole, were found insufficient to provide diverse recreational opportunities within the Forest.

The new Timber Management Plan proposed, *inter alia*, a system of roads to replace the haphazard travelways running through the draws and canyons. The average density of roads would be reduced from 2.2 miles to 1.3 miles for every 640 acres. Under the Plan new or upgraded travelways would be intended for long-term service and could be operated continuously, or through the use of closures, intermittently. Travelways not needed for long-range management purposes would be obliterated.

A draft EIS was made available to the public and a period of eleven months allowed for public comment and comment by the Council on Environmental Quality. The final draft devoted a section to the reproduction of these comments and the Forest Service's responses to the comments. Five alternative timber management directions were analyzed. The ability of each of these alternatives to meet management goals was assessed, as well as their probable effects. The proposed plan was described and discussed in detail. The final Draft was transmitted to the Council on Environmental Quality on March 18, 1977.

On June 14, 1978, the Forest Service published an Environmental Analysis Report (EAR) on four proposed timber sales in a 7,000 acre area south of Custer, South Dakota. One of the four sale units is Hay Draw, an area of approximately 2,000 acres. The EAR embodied the information, analysis, goals, and objectives set forth in the programmatic EIS prepared for the overall Timber Management Plan. There was a determination, contained in the EAR, that the probable environmental impacts of the action proposed for the four-unit area were not significant, controversial, or legislatively related. The Forest Service therefore concluded that an Environmental Impact Statement was not required for the four-unit management plan.

The EAR contained a discussion of a new system of roads in the Hay Draw area. Three alternative road systems, including new construction and upgrading some existing roadway, were presented in the EAR. The use of the existing system was not specifically discussed in the EAR. The existing system in Hay Draw is composed primarily of narrow, two-track dirt roads which have been developed primarily through vehicular use rather than construction. Many of these roads are located in draw bottoms. One of the travelways was through the private inholding upon which the plaintiffs reside.

The alternative involving the least amount of construction was chosen for implementation of the timber sale contract for Hay Draw. The contract, awarded to the Edward Hines Lumber Company, defendant-intervenor, on September 29, 1978, required the construction and upgrading of a total of 8.12 miles of road in the Hay Draw area. The system is denominated the 308 Road System. A road, designated 308, will run along the east side of the inholding. Three spurs off of 308, styled 308.1B, 308.-1C, and 308.1D, are also to be constructed pursuant to the timber sale contract. 308.-1B will traverse National Forest land to the north of the inholding and stretch for a short distance down the west side of the inholding. Although portions of 308 and 308.1B are graveled, these roads will primarily be dirt surfaced. Two closures, one on 308 and another on 308.1B, will be constructed for management purposes. For the most part the roads will be built on the sides of slopes, avoiding drainage bottoms. Some of the existing roads will be obliterated, resulting in a lower overall density in the Hay Draw area.

Upon learning of the proposed road construction in the Hay Draw area sometime in 1977, the plaintiffs initiated a series of contacts with Forest Service personnel. The plaintiffs expressed concern about the extent and quality of proposed roads in the area. They offered to grant the Forest Service a limited easement over the travelway existing on the inholding. This offer

was substantiated by the owner of the property. The easement would have allowed access over the existing road to Forest Service personnel and contractors for management purposes. The general public, however, would not have been allowed to use this road. The offer was rejected by the Forest Service.

Work progressed on the actions required by the timber sale contract throughout the fall of 1978 and the winter of 1979, with roughly sixty percent of the planned road building activity completed. A verified complaint and an application for temporary restraining order were filed on April 25, 1979. On April 26, 1979, the Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, upon stipulation, entered a temporary restraining order enjoining the Forest Service and its contractors from further construction of Road 308 or any of its spurs.[1] The case was transferred to this court for further proceedings. The hearing for a preliminary injunction and trial on the merits was consolidated; evidence was taken on May 17, 18 and 19, 1979. The trial was continued until June 14, 1979. Upon resumption of the trial the plaintiff-intervenors moved to amend the complaint. This motion was denied.

## PLAINTIFFS' CONTENTIONS

This case presents three issues:

1. Do the actions contemplated by the management plan and timber sale contract for the Hay Draw area require the preparation of an Environmental Impact Statement in addition to the programmatic EIS prepared in conjunction with the Timber Management Plan for the Black Hills National Forest?

2. Was the Forest Service required to consider the utilization of the existing road system in Hay Draw as an alternative to the road construction proposed in the EAR?

3. Was the decision to proceed with the road construction in Hay Draw arbitrary and capricious?

▮ The motion to amend the complaint made by the plaintiff-intervenors was denied. It would have expanded the relief sought to include the other three units covered by the EAR. It also contained an allegation that the Forest Service failed to comply with Section 7 of the Endangered Species Act, (16 U.S.C. section 1536), by not consulting with the United States Fish and Wildlife Service about impacts the road construction might have on the Bald Eagle. This motion was denied.

The motion was made after the plaintiffs had rested and the defendants commenced their case. Neither of these issues was tried by either the implied or expressed consent of the defendants. See, F.R.Civ.P. 15(b). Although some evidence was introduced that related to the two new issues raised by the amended complaint, the evidence was also relevant to issues already in the case. Under these circumstances the defendants cannot be said to have consented to the trial of the new issues. See, 6 Wright & Miller, Federal Practice and Procedure, section 1493 at p. 466 (1971). Allowing the plaintiffs to raise new issues at this point in the proceeding would have required a major realignment of the defendants' case. At the very least a continuance would have been necessary to allow the defendants to properly prepare. Considering the equitable nature of the relief being sought in the suit, and the fact that the temporary restraining order had already been extended, a further extension of the temporary restraining order would have been inappropriate. The defendant-intervenor was being prevented from proceeding with the contract, the Forest Service's management plans were stalemated, and the holder of another timber sale contract in the four-unit area had not had the opportunity to look out for its interests in the first part of the trial.

There was a further problem with the claim raised under the Endangered Species

1. Completion of graveling was allowed on a limited portion that had already been bulldozed, packed, and prepared for graveling.

Act. A citizen's suit may not be brought under the Act until sixty days after written notice of a violation has been filed with the Secretary of Interior. 16 U.S.C. section 1540(g)(2)(A). No such notice was ever filed. Under the circumstances it is doubtful that this court would have jurisdiction over the claim.

## I
## PROCEDURAL COMPLIANCE WITH NEPA

■ The plaintiffs' first contention is that the actions contemplated by the management plan and timber sale contract for the Hay Draw area require the preparation of an Environmental Impact Statement. Section 102(2)(C) of the National Environmental Policy Act (NEPA) requires that every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment, be accompanied by a detailed environmental impact statement by the responsible federal official. The Forest Service did not prepare a site-specific EIS for the timber sale challenged in this suit because it was determined that the proposed action was not a major federal action significantly affecting the quality of the human environment. This determination is subject to a review of its reasonableness under the circumstances. *Minnesota Public Interest Research Group v. Butz (MPIRG I)*, 498 F.2d 1314, 1321 (8th Cir. 1974). The question of whether the negative determination would have been reasonable in the absence of the programmatic EIS is not reached here; this court concludes that even if the proposed action could be classified a major federal action significantly affecting the quality of the human environment, the programmatic EIS satisfies NEPA.

It is clear that the Timber Management Plan for the entire Forest would have the type of cumulative or synergistic environmental impact upon the region that re-

quires the preparation of a programmatic impact statement. *See, Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). There is no challenge to the EIS as it relates to the entire Forest. Rather, the plaintiffs contend that the timber sale in Hay Draw requires a site-specific impact statement.[2]

■ The test of compliance with the procedural provisions of NEPA is one of good faith objectivity. *Environmental Defense Fund v. Corps of Engineers*, 470 F.2d 289, 296 (8th Cir. 1972). NEPA does not require exhaustive discussion of environmental effects, or an objection free document. In reviewing an agency's compliance, "(t)he touchstone of our inquiry is reason." *Minnesota Public Interest Research Group v. Butz (MPIRG II)*, 541 F.2d 1292, 1300 (8th Cir. 1976).

Although a programmatic EIS may often be inadequate relative to an individual action, there is no reason to require a site-specific statement that would merely duplicate the programmatic EIS. The guidelines set down by the Council on Environmental Quality require subsequent statements on individual actions only when significant environmental impacts were not adequately evaluated in the programmatic statement. 40 C.F.R. section 1500.6(d)(1) (1978). NEPA's "rule of reason does not require rethinking of everything all the time." *Sierra Club v. Andrus*, 189 U.S.App.D.C. 117, 128, 581 F.2d 895, 906 (D.C.Cir. 1978). In *MPIRG I, supra*, 498 F.2d 1314 (8th Cir. 1974), the Eighth Circuit noted that a programmatic EIS could, if properly prepared, obviate the need for a site-specific EIS.

"We are of the view that upon consideration of the overall timber management policy of the Forest Service in an EIS complying with NEPA, each administrative action taken pursuant to that policy will not require a separate impact statement. In other words, if the environmental effects of timber cuttings are con-

---

**2.** In fact the controversy centers on the roads to be built as part of the timber sale contract; the plaintiffs have expressed willingness to al-

low the timber sale to proceed through the use of the road existing on the private inholding.

sidered in the overall EIS, an individual EIS for each timber sale would not be required, absent a material change in circumstances or a departure from the policy covered in the overall EIS." *MPIRG I, supra,* 498 F.2d at 1323, fn. 29.

The EIS subsequently prepared for the Boundary Waters Canoe Area lacked sufficient information to apprise the decision makers as to the manner in which future timber management was to occur. *Minnesota Public Interest Group v. Butz (MPIRG II),* 541 F.2d 1292, 1306 (8th Cir. 1976). The Court recognized, however, that a Timber Management Plan and an accompanying EIS were being prepared for the entire Superior National Forest. It was indicated that future sales could be held under this Timber Management Plan if the accompanying EIS contained comprehensive analysis of the environmental effects of timber management in the BWCA. *MPIRG II, supra,* 541 F.2d at 1307.

■ The programmatic EIS in the case *sub judice* is a comprehensive analysis of the environmental impacts of timber management, including transportation, throughout the Black Hills National Forest. Each of the five areas of inquiry required by section 102(2)(C) were explored in the EIS. The examination was made in light of the prevalent type of environmental conditions existing in the Forest; the Forest being relatively homogeneous. Hay Draw has no feature that would distinguish it from the rest of the Forest so far as the environmental impacts occasioned by road building are concerned. The EIS provided the direction for the development of the management plan for the Hay Draw area. The planned management for the area, as reflected in the EAR, presents no material departure from the timber management policy covered in the EIS. Each of the potential adverse environmental impacts that the plaintiffs advanced at trial were addressed in the EIS.

It is recognized that a programmatic EIS will often be insufficient as it relates to site-specific actions. The EIS may not be detailed enough to satisfy the requirements of NEPA. *Cf., MPIRG II, supra,* 541 F.2d 1292. Or, the program may be so broad in scope that a site-specific EIS is the only manner in which the objectives of NEPA can be met. *Cf., Kelley v. Butz,* 404 F.Supp. 925 (W.D.Mich.1975); and, *Natural Resources Defense Council, Inc. v. Morton,* 388 F.Supp. 829 (D.D.C.1974), *aff'd* 174 U.S. App.D.C. 77, 527 F.2d 1386 (D.C.Cir. 1976), *cert. den.* 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976). But, where the programmatic EIS is sufficiently detailed, and there is no change in circumstances or departure from the policy in the programmatic EIS, no useful purpose would be served by requiring a site-specific EIS.

The plaintiffs have not pointed out any characteristics of the Hay Draw area that would make it significantly different from the type of conditions examined in the programmatic EIS. Nor is there any apparent departure from the transportation policy examined in the programmatic EIS. It should be remembered that the roads involved are primarily dirt-surfaced with some graveling—not four lane concrete highways. Under these circumstances the Forest Service should not be required to rethink the course of action considered in the programmatic EIS.

It is expected that the Forest Service will prepare Environmental Analysis Reports on future timber sales in the Black Hills National Forest. If the EAR reveals significant differences between the specific site and the prevalent conditions examined in the programmatic EIS, a site-specific EIS would be required. Likewise, a departure from the policy scrutinized in the programmatic EIS would necessitate a site-specific EIS. Absent such circumstances individual actions taken pursuant to the Timber Management Plan should not require subsequent statements.

## II

### CONSIDERATION OF ALTERNATIVES

■ The plaintiffs next contend that the Forest Service failed to adequately consider a "no action" alternative to the road

building in the Hay Draw area. This contention is based on section 102(2)(E) of NEPA (formerly section 102(2)(D)), which requires an agency to evaluate alternatives to a proposed action irrespective of an obligation to prepare an EIS. "The duty to develop alternatives under section 102(2)(D) is subject to a rule of reasonableness. The discussion of alternatives need not be exhaustive if the impact statement presents sufficient information for a reasoned choice of alternatives." *Robinson v. Knebel*, 550 F.2d 422, 425 (8th Cir. 1977) (citations omitted). Further, where an alternative has obvious disadvantages it may not be worthy of exhaustive examination in environmental documents. *Iowa Citizen's Council for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849 (8th Cir. 1973). "The question to be asked is whether all reasonable alternatives to the project have been considered, even if some were only briefly alluded to or mentioned." *Environmental Defense Fund, Inc. v. Armstrong*, 352 F.Supp. 50, 57 (N.D. Cal.1972) (quoted with approval in *ICEQ v. Volpe, supra*, 487 F.2d at 853). In determining the extent of detail required, the complexity of the environmental problems involved is to be considered, including whether the action will adversely affect any features of special environmental concern. *Knebel, supra*, 550 F.2d at 426.

The programmatic EIS considered five alternatives. One of the alternatives was a "no action" approach that involved a continuation of the timber and travel management plan in use at the time. In addition the EIS identified several inadequacies associated with the type of draw bottom travelways found throughout the Forest. These inadequacies included susceptibility to poor drainage and soil erosion, narrowness, and poor location for wildlife management purposes. The road system was also found to be inadequate for public recreational use.

The Hay Draw area was one of those identified in the EIS as having a road system that did not adequately serve management goals. The EAR refers to and incorporates the goals set forth in the EIS.

Three alternatives are dealt with in detail in the EAR. The plaintiffs' contention centers on the failure to deal with the alternative of using the existing road that runs through the inholding in the EAR. Under the circumstances this is not fatal.

Although the specific road was not discussed, the option of using existing roads was dealt with in the EIS, and their shortcomings discussed. The use of the existing road through the inholding further had the obvious disadvantage of not filling all the management needs of the Forest in that area. All the problems associated with the draw bottom travelways pertained to this existing road. Finally, the existing road would have required substantial upgrading, using public funds, with the public thereafter barred from using the road.

It cannot be said that all reasonable alternatives were not at least briefly considered in either the EIS or the EAR. Given the nature of the proposed action, and the lack of any unique characteristics in the area, the rule of reason compels a finding that alternatives to the 308 road system were adequately explored.

## III

### SUBSTANTIVE REVIEW OF THE FOREST SERVICE'S DECISION

The plaintiffs' final contention is that the decision to build new roads and the upgrading of some existing roads in the Hay Draw area violated a substantive obligation to minimize all unnecessary environmental impacts in the Hay Draw area. It is clear that this court is not allowed to substitute its judgment for that of Forest Service. *See, ICEQ v. Volpe, supra*, 487 F.2d 849. The scope of substantive review is limited to two determinations: 1) Whether the agency reached its decision after a full, good faith consideration and balancing of environmental factors; and 2) Whether the agency's actual balance of costs and benefits was arbitrary or clearly gave insufficient weight to environmental values. *MPIRG II, supra*, 541 F.2d at 1300. Quite simply, the court cannot "interject itself

within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club, supra,* 96 S.Ct. at 2730 n. 21. Overturning the Forest Service's decision in this case would require just such interjection.

Virtually all of the objections the plaintiffs have raised were addressed in either the EIS or the EAR. Some of the management goals are conflicting; providing recreational opportunities may not create optimum wildlife habitat. Both the general approach in the EIS and the specific actions proposed in the EAR evince a diligent attempt by the Forest Service to balance competing needs. The plaintiffs point to only one or two interests that might be better served if the existing road is used. There is actually reason to believe that following the course of action urged by the plaintiffs might result in greater environmental harm than the road system proposed by the Forest Service.

The major objection advanced relates to wildlife habitat and a potential increase in poaching. The timber sale contract contains required actions that will not only maintain wildlife habitat in the area, but actually improve the habitat. The poaching problem was considered in the EIS; providing for a vegetative "buffer" along the edge of roads was the management tool adopted to meet the problem.

Far from being arbitrary, the proposed road may well be the most environmentally sound manner of conducting the timber sale. It is obvious that great weight was given to environmental concerns, and efforts were taken to minimize any unavoidable adverse effects. Not everyone may agree with the course of action taken by the Forest Service, but the action is clearly within the discretion invested in the Forest Service and will not be disturbed by this court.

### CONCLUSION

The decision to construct a new system of travelways in the Hay Draw area complied with the procedural and substantive requirements of NEPA. The requested injunction against the road building activities in Hay Draw is therefore denied.