OLMSTED CITIZENS FOR A BETTER COMMUNITY, a nonprofit Minnesota corporation; John Wheeler, Lowell Fredin and Ralph Lindeen, individually, and the City of Rochester, Plaintiffs,

v.

UNITED STATES of America; Bureau of Prisons, a bureau of the United States Department of Justice; Norman A. Carlson, Director of the Bureau of Prisons, individually and in his official capacity; Loy S. Hayes, Chief, Office of Facilities Development and Operations, Bureau of Prisons, individually and in his official capacity; State of Minnesota; Olmsted County, and the Olmsted County Board of Commissioners and its members, individually and in their official capacity, Defendants.

Civ. No. 4–84–492.

United States District Court,
D. Minnesota,
Fourth Division.

March 20, 1985.

Bruce Faulken and Craig Norman, Ross, Faulken & Rosenblatt, Ltd., St. Paul, Minn., for Olmsted County Citizens for a Better Community and the individually named plaintiffs.

Frederick S. Suhler, Rochester City Atty., Rochester, Minn., for City of Rochester.

James E. Lackner, Asst. U.S. Atty., Minneapolis, Minn., and David Collins, U.S. Dept. of Justice, L. Clayton Smith, Jr., Attorney-Advisor, U.S. Bureau of Prisons, Washington, D.C., for the U.S., the Bureau of Prisons, and individually named defendants.

Robert R. Nardi, Sp. Asst. Atty. Gen., St. Paul, Minn., for State of Minn.

Raymond Schmitz, Olmsted Co. Atty., Rochester, Minn., for Olmsted County and Olmsted County Bd. of Com'rs.

## ORDER

DIANA E. MURPHY, District Judge.

Plaintiffs Olmsted County Citizens for a Better Community, individual residents, and the City of Rochester have brought suit seeking to enjoin the Bureau of Prisons' (BOP) reactivation of a portion of the Rochester State Hospital. Plaintiffs allege violations of their constitutional rights and certain federal statutes, executive orders, regulations and procedures. Jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331, 1346(f), 1361, 2201, and 2202, and 5 U.S.C. § 702. The matter is presently before the court on defendants' motion for summary judgment.

*Background*

Plaintiff Olmsted Citizens for a Better Community (OCBC) is a nonprofit corporation organized under the laws of the State of Minnesota. OCBC is composed of property owners, taxpayers, and registered voters who reside in Olmsted County, Minnesota. The individual plaintiffs are residents of Rochester, Olmsted County, Minnesota, residing in the area of the proposed site of the federal prison.

Defendant Norman A. Carlson is the Director of the BOP and is sued in his official capacity and individually. Defendant Loy S. Hayes is Chief of the Office of Facilities Development and Operations of the BOP and is sued in his official capacity and individually.

The BOP has taken steps to open a Federal Medical Center (FMC) on the site of the former Rochester State Hospital in Rochester, Minnesota. BOP plans to refurbish the former state hospital and use it for the treatment of medical and psychiatric needs of federal inmates.

The site consists of approximately 64 acres of the former state hospital, which was closed by action of the state legislature in 1982. The state hospital treated mental illness, alcohol or drug related problems and provided all forms of psychiatric treatments as well as surgery. The Minnesota Department of Corrections transferred prisoners to the state hospital for acute medical or surgical care, and the hospital treated over 185 inmates between 1972 and 1975. The Minnesota Parole Board granted conditional medical paroles and sent state inmates to the state hospital for psychiatric or drug related treatment prior to their eventual release.

After the state facility was closed due to budget restraints, it was conveyed by quitclaim deed, dated December 29, 1982, from the State of Minnesota to the Olmsted

County Board of Commissioners (Board) for one dollar. The conveyance was made subject to the following "exceptions, terms and conditions:"

That in consideration of this conveyance, party of the second part [County of Olmsted] agrees that any conveyance of the above-described real property will be as follows. Party of the second part may, at nominal cost, convey real property to other governmental entities or non-profit organizations. The party of the second part agrees that any other conveyance of the above-described real property will be sold at public auction or advertised and sold by sealed bid to achieve maximum market value.

The Board conveyed a portion of the state hospital site to the BOP on May 1, 1984 for $14 million. No public auction was held, nor was the property sold by sealed bid. The price was determined through an independent appraisal, which estimated the site to have a fair market value of $14 million.

Since 1981 the BOP national inmate population has increased over 8,000 to an all time high, on May 24, 1984, of 32,040. The current rated capacity of the BOP's facilities is 24,503. There is therefore a 30% level of overcrowding system-wide.

There are 845 medical beds currently available in the federal prison system. The present medical/surgical/psychiatric population, including those waiting for treatment bedspace, is 1,151. This makes a net deficit of 306 medical beds at the current population. Based on estimates of continued population growth to 1989, BOP predicts a medical bedspace shortage of between 77 and 326 beds, assuming the addition of 364 beds from the reactivation of the Rochester State Hospital.

Director Carlson was first notified of the availability of the former Rochester State Hospital during April, 1983. A tour of the facility was arranged, and Carlson subsequently entered into preliminary negotiations to consider acquiring the hospital for reactivation as a FMC. The BOP submitted a proposal to the Board for its consideration in July, 1983. The BOP also invited the County Board and other local officials (including the Rochester City Council) to attend a tour of two similar BOP facilities in Springfield, Missouri and Butner, North Carolina. The tour was attended by 26 persons, including all members of the County Board, Rochester City Councilman Peter H. Solinger and Rochester Mayor Chuck Hazama.

The County Board held a public meeting on August 30, 1983 to permit the Bureau to meet for discussions and receive comments from the citizens of Rochester and Olmsted County. In excess of 2,000 citizens were present, along with Director Carlson and several Bureau staff members.

The Draft Environmental Impact Statement (draft EIS) was prepared and published on November 23, 1983. The period for public comments on the draft EIS closed on February 3, 1984. BOP contends that it reviewed all comments and addressed those that raised significant issues in the Final Environmental Impact Statement (EIS), which was published on February 24, 1984. All comments received were appended to the EIS. Final commenting on the EIS closed 30 days later on March 24, 1984. BOP contends that all comments to the EIS were reviewed by Director Carlson prior to his decision to proceed with the project and prior to issuing his Record of Decision, which was signed and released on April 17, 1984.

Copies of the Record of Decision were sent to all interested parties, and a copy was published in the *Rochester Post Bulletin*. A member of OCBC was personally notified by telephone on the morning of April 18, 1984. The Record of Decision stated that the BOP would negotiate with the Board to purchase and activate the former state hospital as a Federal Medical Center.

Several months prior to issuing the Record of Decision, Congress was notified of the potential purchase of the Rochester State Hospital. A check in the amount of $14 million was received by the BOP from

the Department of the Treasury on April 25, 1984. Congress' approval was originally expected in the week following the issuance of the Record of Decision, but was delayed by the absence of Congressional staff members. Approval was finally received on May 1, 1984 at 9:50 a.m. Shortly thereafter, BOP presented a formal offer to the Board to acquire the state hospital for $14 million. The Board accepted the offer, and the deed was recorded.

Upon receipt of the $14 million, the State of Minnesota agreed to authorize matching funds in order to establish a four year college program in the City of Rochester. In addition, Olmsted County plans to use a portion of the proceeds to build a solid waste or refuse recycling plant. The current landfill will cease to operate in 1986.

The facility as planned will house 500 inmates and have a staff of 360 full-time employees.[1] The inmate population will consist of mental health patients, medical patients, and general minimum/medium custody inmates. The EIS indicated that the BOP proposed to install a double perimeter security fence, site lighting, and electric surveillance systems, to ensure security. In addition, the EIS indicated that an armed mobile patrol would be conducted around the entire perimeter. These patrols were apparently to be conducted on a specially constructed road around the facility. Finally, the EIS indicated that the BOP would add "berms and a natural landscaped buffer zone of both evergreen and deciduous trees on the west site boundary to minimize any visual intrusion on the neighboring community."

Plaintiffs' complaint asserts seven causes of action. Count I alleges that the BOP failed to comply with the provisions of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347. Count II alleges that the BOP violated Executive Order No. 11988 (E.D. 11988), which concerns flood plain development, and Department of Justice Guidelines implementing said order. Count III alleges that the United States and the BOP violated 40 U.S.C. §§ 531 and 533, which govern compliance with local zoning ordinances. Count IV alleges that the BOP violated the Intergovernmental Communications Act, 31 U.S.C. § 6501 et seq. Count V alleges that defendants denied plaintiffs their constitutional right of access to the courts. Count VI seeks a declaratory judgment quieting title with respect to the FMC site.[2] Count VII seeks a substantive review of the BOP's decision.

Upon filing the action, plaintiffs sought a preliminary injunction enjoining BOP "from taking any action in furtherance of the Bureau's plans to place a federal penal institution on the site of the former Minnesota State Hospital in Rochester, Minnesota," and enjoining Olmsted County from disbursing any proceeds received by Olmsted County from BOP for the acquisition of the proposed prison site, pending trial on the merits. In an order dated July 27, 1984 the court denied the motion for a preliminary injunction because plaintiffs had failed to establish the Dataphase factors.[3]

On their present motion, defendants seek summary judgment upon all seven counts in plaintiffs' complaint and dismissal of the action. A hearing was held on defendants' motion, and memoranda and affidavits have been submitted by opposing parties. The plaintiffs were given until January 14,

---

1. It is projected that the facility will have an annual operating budget of $10 million. The BOP projects that 80% of these funds would flow into the local economy.

2. Pursuant to a stipulation signed by the plaintiffs, the State of Minnesota has been dismissed without prejudice. Count VI of plaintiffs' complaint is the only count which pertained to the State of Minnesota.

3. *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir.1981). The court emphasized that plaintiffs had not made the necessary showing of irreparable harm in that the balance of harm and public interest weighed in defendants' favor. The court was unable at that time to determine the likelihood of success on the merits but noted that there appeared to be factual issues. The inquiry on summary judgment, of course, is whether any genuine issues of material fact exist.

1985 to respond to the affidavit of J.D. Swinson, Jr., submitted by defendants at the hearing. Subsequently, the plaintiffs indicated that no response would be forthcoming, and the motion was formally taken under advisement by the court.

*Discussion*

In passing upon a motion for summary judgment, the court is required to view the facts in the light most favorable to the nonmoving party, and the movant has the burden of establishing that no genuine issue of material fact remains and that the case may be decided as a matter of law. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir.1983); *Ralph's Distributing Co. v. AMF, Inc.*, 667 F.2d 670 (8th Cir.1981). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in pleadings and affidavits. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076 (8th Cir.1980). However, the nonmoving party may not merely rest upon allegations or denials of the party's pleadings, but must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir.1981).

**NEPA**

■ Plaintiffs assert in counts one and seven of the complaint that the EIS prepared by the BOP fails to comply with the procedural and substantive requirements of NEPA. NEPA requires federal agencies to consider every significant aspect of the environmental consequences of its actions and to inform the public that it has considered those environmental concerns in its decisionmaking process. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 96–98, 103 S.Ct. 2246, 2252–53, 76 L.Ed.2d 437 (1983). Yet, agencies are not required to elevate environmental concerns over other appropriate considerations. *Id.; Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (per curiam).

■ The duties imposed by NEPA are "essentially procedural." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). The agency is required only to take a "hard look" at the environmental consequences before taking a major action. *Baltimore Gas & Elec. Co.*, 462 U.S. at 97, 103 S.Ct. at 2253. The court in turn exercises only a limited form of judicial review when faced with a challenge to an agency's compliance with NEPA. *Farmland Preservation Ass'n v. Goldschmidt*, 611 F.2d 233, 237 (8th Cir.1979). A two-part test, has been formed: "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious. *Baltimore Gas & Elec. Co.*, 462 U.S. at 97–98, 103 S.Ct. at 2253; *Strycker's Bay*, 444 U.S. at 228 & n. 2, 100 S.Ct. at 500 & n. 2; *Sierra Club v. Forehkle*, 534 F.2d 1289, 1300 (8th Cir.1976). The burden is on the plaintiff to show by a preponderance of the evidence that the agency has not met these tests. *Sierra Club v. Forehkle*, 534 F.2d at 1300.

The court first must determine whether the challenged EIS is adequate to satisfy the requirements of Section 102 of NEPA, 42 U.S.C. § 4332.[4] *Farmland Reservation*

---

4. Congress has mandated under Section 102 that federal agencies to the fullest extent possible:

 (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

 \* \* \* \* \* \*

 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

 (i) the environmental impact of the proposed action,

 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

 (iii) alternatives to the proposed action

 \* \* \* \* \* \*

 (v) any irreversible and irretrievable commitments of resources which would be in-

*Ass'n*, 611 F.2d at 237. The test of compliance with these

> procedural provisions is one of good faith objectively ... the touchstone of [the] inquiry is reason.... While the detailed statement must of course be more than a *pro forma* ritual ... the discussion of environmental effects and alternative courses of action need not be exhaustive.... The EIS need contain only sufficient information to permit a reasoned choice of alternatives.... The purpose of NEPA is not to require an objection free document, but rather to give Congress, the responsible agenc[ies] and the public a useful decisionmaking tool.

*Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292, 1300 (8th Cir.1976), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977); *see also James River Flood Control Ass'n v. Watt*, 553 F.Supp. 1284, 1288 (N.D.S.D.1982).

The EIS issued by the BOP on February 24, 1984 is 25 pages in text with attachments, including exhibits and comments submitted exceeding 150 pages. The BOP acknowledges that the EIS is a relatively brief document but contends that it is nevertheless more than adequate because the project contemplates no major changes in the use and operation of a century old institution. The BOP further argues that because of the similarity in uses it was not even required to prepare an EIS. Under the BOP's own procedures an EIS is not necessary for "acquisition of surplus facilities for conversion to a Federal correction institution." 28 C.F.R. Part 61, App. A

10(1). The plaintiffs argue, on the other hand, that the uses are not similar and the brevity of the EIS and its lack of analysis establish that it does not satisfy NEPA's requirements for a detailed statement.

■ An EIS is not required if the BOP's proposed use of the state hospital facility is not a major Federal action significantly affecting the environment. NEPA § 102(C), 42 U.S.C. § 4332(C). When an existing facility is simply renovated and continued to be used in the same general manner as it was previously, there is no significant impact on the "human environment". *Como-Falcon Community Coalition, Inc. v. United States Dep't of Labor*, 609 F.2d 342 (8th Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); *Nucleus of Chicago Homeowners Ass'n v. Lynn*, 524 F.2d 225, 231 & n. 4 (7th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). "When the threshold requirement of a primary impact on the physical environment is missing, socio-economic effects are insufficient to trigger an agency's obligation to prepare an EIS." *Id.* (quoting *Image of Greater San Antonio, Tex. v. Brown*, 570 F.2d 517, 522 (5th Cir.1978)). An agency's decision not to prepare an EIS may be overturned only where the agency's determination was not reasonable under the circumstances. *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1320 (8th Cir.1974) (en banc).

If an EIS is not required, an agency is to prepare an environmental assessment, a concise document that serves to:

\* \* \* \* \* \*

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

\* \* \* \* \* \*

42 U.S.C. § 4332. The Council on Environmental Quality has formulated guidelines, codified at 40 C.F.R. §§ 1500–1508, to assist federal agencies in the preparation of environmental impact statements. These guidelines are to be accorded substantial weight in reviewing compliance with NEPA. *Minnesota Public Interest Research Group v. Butz*, 541 F.2d at 1299 n. 15 (8th Cir.1976), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977).

volved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9; *see* 40 C.F.R. § 1501.3. The agency is also to prepare a finding of no significant impact in the form of a brief document why the language of NEPA section 102(C), 42 U.S.C. § 4332(C) is not applicable. 40 C.F.R. § 1508.13.

 The court has carefully reviewed the complete record and finds as a matter of law that the BOP was not required to prepare a EIS because the conversion from a state hospital facility to a FMC does not give rise to a significant environmental impact. The state hospital has occupied the site for over 100 years, and the present buildings have been in place since 1961. The limited physical additions, such as a double perimeter security fence and a one lane perimeter road, do not involve the necessary primary impact on the physical environment.

This case is similar to *Como-Falcon Community Coalition, Inc. v. United States Dep't of Labor,* 609 F.2d 342 (8th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980), where the conversion of a college and seminary to a Job Corps center for disadvantaged youths was found not to require an environmental impact statement. The *Como-Falcon* court held that such a transition would not substantially alter the character of the neighborhood. *Id.* at 346. Similarly, the continued use of the state hospital site as a

facility for the medical treatment of prisoners will not substantially alter the character of the surrounding neighborhood. The continued use of the site as a hospital would appear to keep it within the exception to the area's residential zoning designation "for any hospital for human care." *See* Affidavit of Chuck Hazama ¶ 4; Affidavit of Peter H. Solinger ¶ 3. When local zoning regulations are complied with, there may even be a presumption that the incremental impact on the environment is not "significant", that the basic environmental impact from the project derives from the land use pattern approved by local authorities.[5] *Como-Falcon Community Coalition, Inc. v. United States Dep't of Labor,* 465 F.Supp. 850, 865 (D.Minn.1978), *aff'd as modified,* 609 F.2d 342 (8th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980).

The absence of a significant impact on the "human environment" as that term is defined under NEPA entitles the BOP to summary judgment on the claims asserted under the Act. It should be noted that this action is not in the normal posture for such a ruling because the BOP did prepare a complete EIS and only now contends that the process was not required. Thus, the normal test, whether the agency made a good faith and reasonable determination that an EIS is not required, does not directly fit the circumstances of this case.

 Nevertheless, the document prepared by the BOP satisfies the requirements of an environmental assessment and establishes that no EIS was necessary because there is no significant impact on the environment. A concise statement may be sufficient to support an agency finding of no significant impact if it is grounded on supporting evidence. *See, e.g., Nucleus of Chicago Homeowner's Ass'n,* 524 F.2d at 231. The ultimate determination of the BOP that no EIS was required is supported by the administrative record and the EIS

---

**5.** The BOP has not formally sought any zoning permit because under the Supremacy Clause,

U.S. Const. art. VI, cl. 2, the federal government is not subject to regulation by local ordinance.

that was in fact prepared.[6] It is true that the plaintiffs did not have the opportunity to challenge a specific document entitled an Environmental Assessment or a finding of no significant impact. Functionally, however, the administrative process and the EIS gave the plaintiffs an even greater opportunity to challenge the BOP's conclusion that the location of the FMC at the former state hospital site would involve no significant environmental impact.

The heart of the objections raised by OCBC and the other plaintiffs in reality go to the psychological distaste for the type of individuals using the facility, namely prisoners, and not to the continued use or the modifications of the hospital. The impact from this so-called "people pollution" of the environment is not the type recognized under NEPA. *See Como-Falcon,* 609 F.2d at 345–346; *Nucleus of Chicago Homeowners Ass'n,* 524 F.2d at 231; *Hanley v. Kleindienst,* 471 F.2d 823 (2d Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). The various social and economic factors raised by the plaintiffs are similar to those asserted in *Como-Falcon,* and here, as in that case, they need not have been considered by the agency because the threshold requirement of a primary impact on the physical environment is missing. *Como-Falcon,* 609 F.2d at 345. The Supreme Court has recently emphasized that while the operation of a facility such as the FMC is an event in the physical environment, factors such as the psychological health damage to neighboring residents resulting from unrealized risks of crime are too far removed from that event to be covered by NEPA. *Metro Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 775, 103 S.Ct. 1556, 1562, 75 L.Ed.2d 534 (1983). The BOP adequately considered factors such as the risk of crime and the risk of decreasing property values, but under governing case law such an evaluation was not required.

Even if an EIS were required, the BOP would still be entitled to summary judgment because the EIS it prepared satisfies the requirements of NEPA as a matter of law. The EIS must be examined in light of the particular facts and circumstances surrounding the project; the extent of detail required is necessarily related to the complexity of the environmental problems involved. *Robinson v. Knebel,* 550 F.2d 422, 426 (8th Cir.1977); *Iowa Citizens v. Volpe,* 487 F.2d 849, 852 (8th Cir.1973). No preordained number of pages, studies or criteria must be included or satisfied. Rather, the adequacy of the EIS "is determined by a rule of reason which required only 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 592 (9th Cir.1981) (quoting *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974).

In that light the court now turns to evaluate the various arguments raised by the plaintiffs as to the adequacy of the EIS. Prior to criticizing the actual contents of the EIS, the plaintiffs allege that the agency decisionmaker improperly committed himself and the agency to selecting the Rochester site before reviewing the EIS. In support of this position, the plaintiffs cite letters from Mr. Carlson, director of the BOP, in the summer and fall of 1983 that discuss the agency's proposal [to develop the FMC] and plan to activate the former state hospital without any mention of an intent to review environmental factors.

Under NEPA the agency is not required to prepare a final impact statement until it makes a recommendation or report on a proposal for federal action. *Aberdeen & Rockfish Railroad Co. v. SCRAP,* 422 U.S. 289, 320, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975). Thus, a necessary precursor to the EIS is a proposal such as the one described in the letters

---

6. The discussion, *infra,* holding that the EIS satisfies the requirements of NEPA also establishes that the BOP adequately discussed the factors necessary to support its final conclusion that no EIS was required.

from Carlson. Carlson's involvement is not improper because it is the agency that is required to prepare the EIS, and NEPA assumes as inevitable an institutional bias within an agency proposing a project. *Westside Property Owners v. Schlesinger,* 597 F.2d 1214, 1218 (9th Cir.1979); *Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289, 295–296 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); *Concerned about Trident v. Schlesinger,* 400 F.Supp. 454, 491 (D.D.C.1975), *aff'd in part,* and *rev'd in part on other grounds,* 555 F.2d 817 (D.C.Cir.1977). Carlson's letters merely indicate the agency's preference, while emphasizing that additional discussion and approvals would be necessary. The Record of Decision on the proposal by the BOP was not until April 19, 1984, while the EIS was published February 24, 1984. Thus the agency decisionmaker and Congress were provided with enough time to allow the EIS to contribute effectively to the decisionmaking process. *See* 40 C.F.R. § 1507.5.

The plaintiffs attack the actual preparation of the EIS on two grounds; first, that the agency failed to utlize an interdisciplinary approach and second, that it was not a good faith effort by the BOP but rather that it was biased and merely an attempt to justify a decision that already had been made.

The agency is required to "utilize a systematic interdisciplinary approach" in preparing the EIS. 42 U.S.C. § 4332(2)(A). The plaintiffs assert that no preparer had any expertise in assessing environmental impacts and that there is a factual dispute as to whether the necessary interdisciplinary approach was taken. Section VII of the EIS lists as the preparers of the document five employees of the BOP with varied educational backgrounds including architecture, engineering, and political science. Affidavits submitted by the BOP indicate that additional agency personnel

with various backgrounds and experience were also involved in the preparation of the EIS. *See* Affidavit of James B. Jones ¶ 3; Affidavit of Norman Carlson ¶ 6 (June 3, 1984).

The plaintiffs claim that the BOP failed to utilize an interdisciplinary approach is factually inaccurate. NEPA does not require that a specific class or number of experts be consulted; nor does it require that the interdisciplinary approach involve preparers outside of the agency. *Nucleus of Chicago Homeowner's Ass'n v. Lynn,* 524 F.2d 225, 232 (7th Cir.1975). The BOP enlisted the input of individuals with a variety of relevant backgrounds. More importantly, the EIS evidences that a wide range of factors including sociological, architectural, historical and others were considered in its preparation. In the context of this case, the duty to engage in an interdisciplinary approach has been satisfied. *See, e.g., Missouri ex rel. Ashcroft v. Department of Army,* 526 F.Supp. 660, 676 (W.D.Mo.1980), *aff'd,* 672 F.2d 1297 (8th Cir.1982).

The claim that the EIS is insufficient because it is the product of bias is more properly taken up in the court's general inquiry into the good faith objectivity and reasonableness of the specific sections of the EIS. The EIS cannot provide the necessary basis for a reasoned decision if it is knowingly incorrect or incomplete or it has been compiled without an effort in objective good faith to obtain accurate information.[7] *See Sierra Club v. United States Army Corps,* 701 F.2d 1011, 1035 (2d Cir. 1983).

The inquiry now turns to the contents of the EIS and whether in light of the particular circumstances, it is sufficient to put interested persons on notice of the significant impacts on the environment. *Iowa Citizens v. Volpe,* 487 F.2d 849 (8th Cir. 1973); *MPIRG v. Adams,* 482 F.Supp. 170, 176 (D.Minn.1979). The plaintiffs raise four specific inadequacies of the EIS: 1) it

---

**7.** The additional argument that the statement is merely justifying a decision already made parallels the claim already rejected that the agency

decisionmaker was impermissibly committed to the site.

fails to identify or address the environmental consequences of the project in any meaningful way; 2) it fails to address alternative courses of action in any meaningful way; 3) it does not respond to the comments and objections made by interested parties; and 4) it does not recognize or address conflict between a federal prison and local land use laws and objectives.

Plaintiffs assert that the EIS fails to address any of the adverse environmental impacts of placing a federal prison next to an existing residential area. Specifically, they allege an absence of any meaningful discussion on the affect on the character of the neighborhood, the sociological and psychological impacts on an area's residents, safety considerations, and compatability with local land use practices. The BOP contends that because the use of the site as an FMC is essentially the same as its previous use as a state hospital, there are no significant environmental consequences to be discussed. It further argues that in any event the areas of concern raised by plaintiffs are adequately addressed in the EIS.

The EIS addresses a wide range of potential environmental concerns, basically following the recommended format specified on the CEQ regulations. *See* 40 C.F.R. § 1502.10. Each area of its analysis is predicated on the project's continued use of the site for virtually the same purposes for which it was originally intended: the housing, feeding, and care of medical and men-

tal health patients. In this case, of course, the patients would be in federal custody.

■ The direct impact upon the environment from the proposed action is quite limited. It results from the renewed use of the hospital facilities and the few physical alterations of the site: alterations made solely for the purpose of improving security. The EIS adequately discloses the impacts and effects on the land, water, and air, and the plaintiffs for the most part do not challenge those aspects of the EIS. The EIS also adequately details the proposed construction and its impact on the visual landscape, noting that natural vegetation will be added to minimize the changes.[8] *See National Ass'n of Property Owners v. United States*, 499 F.Supp. 1223, 1226 n. 28 (D.Minn.1980), *aff'd* 660 F.2d 1240, *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982).

Plaintiffs do claim that the discussion of safety and local land uses is inadequate and biased. A review of the EIS shows that it discloses the environmental impacts in a satisfactory manner. It details the new construction and other measures intended to improve security and discloses that while similar facilities have proven generally safe, escapes have nevertheless occurred. While not all relevant information is included in this discussion, it is not a misrepresentation of the facts or any opinions relied on and it presents the possible impacts with the necessary good faith objectivity.[9]

---

**8.** Certain physical modifications of the site have been undertaken during the course of this litigation. The parties agreed that any such changes should not affect the merits of the action and if the plaintiffs were to prevail, all new construction would be removed. On September 25, 1984 this court issued an order permitting construction of a one-story entrance building to go forward in the interim.

**9.** Plaintiffs point to the BOP's failure to include any discussion on the impact of an entry building for the FMC as evidence of bias and inadequate disclosure. The BOP asserts that because plans for the entry building were not finalized it was not discussed in the EIS as a separate item of construction. Director Carlson states that he did not believe the lack of discussion to be significant since an entry building would neces-

sarily have to be built as the access point in the perimeter fence. Affidavit of Norman Carlson ¶ 3 (Sept. 10, 1984). Subsequently, the BOP prepared an environmental assessment and Director Carlson issued a finding of no significant impact from the construction of the entrance building.

The purpose of an EIS is disclosure. Although the entrance building was included in the site plan appended to the EIS as Exhibit K, specifically including it in the body of the EIS would have provided a more complete disclosure. NEPA, however, does not require an objection-free document or exhaustive discussion of the effects on the environment, but rather, substantial compliance with its goal of disclosure of environmental impacts. *Missouri, ex rel. Ashcroft v. Dep't of the Army*, 672 F.2d at 1303; *Ventling v. Bergland*, 479 F.Supp. 174, 179 (D.S.

A review of the EIS shows also that it adequately addresses any conflict with local zoning ordinances and neighboring land uses. The EIS discusses both that the FMC is consistent with the prior land use of the site and that under the Supremacy Clause, U.S. Const. art. VI, cl. 2, the BOP need not formally comply with local zoning practices. There simply is no duty under NEPA in these circumstances to do more; the impact on future speculative uses of the site or surrounding area need not be evaluated. *See Monarch Chemical Works, Inc. v. Exxon,* 466 F.Supp. 639 (D.Neb.1979).[10] Plaintiffs argue that the EIS is misleading because it deliberately fails to indicate that the FMC site is directly adjacent to a neighborhood. It is clear, however, from the EIS taken as a whole and the entire administrative process that the existence of the neighboring community was a highly visible factor and that the concerns raised by that proximity were considered and disclosed. Neither these instances nor any of the other examples cited by the plaintiffs show any impermissible bias in the EIS. The BOP's duty is to submit a EIS prepared with good-faith objectivity. The fact that they have come to a different conclusion than plaintiffs' desire is no reason to find fault with the EIS. *Fayettville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1026, *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140 (1975).

Plaintiffs also argue that the EIS fails adequately to discuss the possible secondary socio-economic effects resulting from the proposed action. To the extent BOP has any duty to consider such effects in this situation, that duty is limited by the requirement in section 102 of NEPA that there be a reasonably close causal relationship between a change in the physical environment and the effect at issue. *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 103 S.Ct. 1556, 1561, 75 L.Ed.2d 534 (1983).

Under this "proximate cause" standard, fears that the reactivation of the state hospital site as a federal medical center will change the character of the neighborhood, reduce property values, and increase the dangers of crime may not be cognizable under NEPA. NEPA is intended to require agencies to be aware of the effect of their proposed actions on the physical environment: the air, land, and water which support life. *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. at 771, 103 S.Ct. at 1560. The psychological and sociological effects upon individuals from having prisoners nearby are not recognized under NEPA in the circumstances presented by this case. Any causal connection to the limited change in the physical environment is tenuous at best, and in addition, these types of effects do not lend themselves to measurement. *See id.; Nucleus of Chicago Homeowners Ass'n v. Lynn,* 524 F.2d 225, 231 (7th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Hanly v. Kleindienst,* 471 F.2d 823, 833 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

Although the BOP may not have been required to address factors such as the risk of crime, property values, and the character of the neighborhood, it nevertheless did consider and disclose such factors. In addition, the EIS evaluates the economic and social impact of the proposal on the City of Rochester as a whole. *See* EIS 11–21. Plaintiffs' arguments here as well as in other places appear to be misdirected

D.1979), *aff'd* 615 F.2d 1365 (8th Cir.1979). Furthermore, the addition of the entry building has a limited impact on the environment and increases even further the security of the facility. While the specific inclusion of the entry building would have improved the EIS, its omission does not show bias, nor does it make the EIS inadequate.

10. The United States objects to the introduction of the affidavits of B.B. Chapman, a professional planner in various aspects of urban planning and environmental services, because his testimony was not part of the administrative record. For purposes of this motion the court has fully considered the affidavits in reaching its determination that the EIS satisfies the requirements of NEPA as a matter of law.

towards the merits of the proposed action rather than the adequacy of disclosure. Factual disagreement among experts does not serve to invalidate the EIS or preclude summary judgment; scientific unanimity is not required. *Life of the Land v. Brinegar,* 485 F.2d 460, 472–73 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

What is required is disclosure of environmental impacts, and the EIS satisfies that standard as a matter of law. The EIS provides a record upon which a decisionmaker could arrive at an informed decision. Although in hindsight one might add to, or expound on various aspects of the EIS, the determination that the agency has presented a reasonable evaluation of the environmental consequences of the proposal ends this part of the court's inquiry.

■ NEPA § 102 also requires the BOP to consider the reasonable and prudent alternatives to the proposed action; remote and speculative possibilities need not be considered. *Miller v. United States,* 654 F.2d 513, 514 (8th Cir.1981). The impact statement should present sufficient information for a reasoned choice of alternatives. *Robinson v. Knebel,* 550 F.2d 422, 425–26 (8th Cir.1977).

■ The BOP asserts that none of these alternatives were reasonable or prudent but that in any event its discussion shows they were given reasonable consideration. The EIS addresses four alternatives to the Rochester site; a new 500-bed medical center, other surplus property, contracting for services at state and county institutions, and no action. The plaintiffs have failed to show that any other alternatives were reasonable and should have been considered. Their claim is essentially that the EIS failed to adequately disclose these four alternatives to the decisionmaker.

The EIS details the severe liabilities of each alternative and gives the factual basis to support a conclusion that no reasonable and prudent alternative existed. The EIS indicates that the purpose of the action is to alleviate the pressing need for medical facilities. Its evaluation that the alternative of no action is not a viable option because of that pressing need is adequate disclosure. The EIS also detailed the overcrowding in nonfederal facilities especially for prisoners with medical needs, thus eliminating the need to consider that course of action any further. The availability of other surplus properties is perhaps the most plausible alternative. The EIS notes that the BOP has for several years conducted a search for acceptable sites but that only one location has been identified as a viable alternative, that being the Rochester site.[11] The plaintiffs contend that the rejected sites and the criteria used in the evaluation should have been identified. There is no indication that any other site exists that would be a reasonable and prudent alternative, however. *Cf. Roosevelt Campobello Int'l Park v. EPA,* 684 F.2d 1041, 1047 (1st Cir.1982). The disclosure given therefore was sufficient to inform the decisionmaker of this alternative.

The discussion concerning the construction of a new facility focused on the additional costs of approximately $15,000,-000 compared to the Rochester site. The alternative was not discussed further because the BOP believed the costs were prohibitive. Regardless of whether this alternative was unreasonable because of its costs, it was placed before the decisionmaker contrary to plaintiffs' argument that projects costlier than Rochester were not considered. The EIS provided the decisionmaker with all the alternatives to the Rochester site and detailed the specific reasons why each alternative did not merit further discussion.

■ The discussion of alternatives, although brief, is reasonable under the circumstances of this case and is sufficient to allow the decisionmaker to make an in-

11. The EIS indicated that in addition to the physical and financial attributes of the hospital site, Rochester was also highly desirable because of the extensive medical community including the Mayo Clinic and the availability of volunteer resources. *See* EIS 2, 11.

formed choice. What is reasonable varies with the circumstances of the case, and under these facts the discussion of alternatives is sufficient to allow for an informed decision. *See, e.g., Farmland Preservation Ass'n v. Goldschmidt*, 611 F.2d 233, 239 (8th Cir.1979); *Robinson v. Knebel*, 550 F.2d 422, 425–26 (8th Cir.1977).

The plaintiffs also assert that the EIS is deficient because it does not respond to the comments made by interested parties as required by the CEQ regulations.[12] 40 C.F.R. § 1503.4. Pursuant to the regulatory scheme, the BOP asked for comments on the draft EIS. Comments from federal, state and local agencies and individuals were received, and all were included in the appendix to the statement. The EIS lists on page 3, seven issues that have been raised by the comments and directs the reader to responses contained in the EIS.[13] The plaintiffs, on the other hand, refer to several comments from interested individuals and groups that were not individually responded to and which they believe were not properly addressed at all.

■■■■■ The duty of the agency in responding to comments is to identify opposing views "such that 'differences in opinion are readily apparent.'" *State of California v. Block*, 690 F.2d 753, 773 (9th Cir. 1982) (citations omitted). Comments from responsible experts that cause concern that a project and its alternatives have not been fully explored require a good faith reasoned analysis by the agency in response. *Silva v. Lynn*, 482 F.2d 1282 (1st Cir.1973). The BOP included in the EIS those issues it felt were significant and its responses

satisfy the duty to make a good faith response. In addition, all comments were attached to the EIS and reviewed by the director of the BOP prior to the Record of Decision. Affidavit of James B. Jones ¶ 5; Affidavit of Norman A. Carlson ¶ 7 (June 3, 1984). Such a procedure provided a meaningful reference that identifies the problems and issues for the responsible official. *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463, F.2d 783 (1971).

■■■ NEPA does not require that the agency resolve the issues raised but only that they be assessed and considered and responded to in the EIS. *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 554 (9th Cir.1977); 40 CFR § 1503.4. The BOP fulfilled this duty. Furthermore, many of the comments did not directly bear on environmental effects recognized under NEPA, thus further limiting the scope of the BOP's duty to respond. *State of California v. Block*, 690 F.2d at 773.

It is true that viewing the facts in the light most favorable to the plaintiffs, there are some disputed factual issues raised in connection with the claims under NEPA. None of those factual issues rise to the level of genuine issues of material fact under NEPA, however. Accordingly, BOP is entitled to judgment as a matter of law on count one of the complaint.

■■■ The court is required to go beyond the procedural review and engage in a very limited substantive review of the BOP's decision. The decision to proceed with the purchase and conversion of the Rochester

---

12. The agency is also required to "consult with and obtain the comments of" related federal agencies. 42 U.S.C. § 4332(2)(C). The complaint contains a claim that the BOP has failed to comply with this provision. The plaintiffs have not argued such a claim, however, and the record supports a finding that the required consultations were made.

13. 1. Would the proposed facility have a positive or negative economic impact on the community?
2. Would the proposed facility have an adverse impact on the amount of criminal activity in the area?

3. Would there be an adverse impact on local property values resulting from the presence of the FMC?
4. Would the addition of perimeter security features on the property negatively impact upon the exterior appearance?
5. Would the perimeter security be adequate to prevent a negative impact on the surrounding community?
6. Would escape procedures impact negatively upon the privacy of citizens?
7. Would there be an overall negative impact on the quality of life in the city of Rochester? EIS 3.

site into a FMC must not be arbitrary or capricious within the meaning of § 10(e) of the Administrative Procedure Act (APA), 5 U.S.C. § 706.[14] Having determined that the BOP considered the relevant factors, the only task remaining for the court is to determine whether the agency has articulated a rational connection between the facts found and the choice made. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2257, 76 L.Ed.2d 437 (1983). The decision to proceed with the Rochester site is well within the bounds of reasoned decisionmaking. *Id.* The need for new facilities has been demonstrated, the Rochester site meets those requirements with only minor modifications, and no other available alternative has such a limited impact on the physical environment. Accordingly, BOP is entitled to summary judgment under count seven.

*Non-NEPA Claims*

In counts two through six of the complaint plaintiffs raise challenges to the proposed FMC beyond the EIS. After a careful review of the complete record and all the proceedings herein the court finds, viewing the facts in the light most favorable to the plaintiffs, that defendants are entitled to summary judgment upon all of these counts as well.

■ Count two of the complaint alleges that defendants have failed to comply with the requirements of Executive Order 11988 (E.O. 11988), 3 C.F.R. 117 (1978), as amended by Executive Order 12148, 3 C.F.R. 412 (1980), *reprinted in* 42 U.S.C. § 4321 app. at supp. 179, which seeks to minimize actions by federal agencies which may adversely affect flood plains. It is debatable whether a private right of action exists under E.O. 11988, but regardless, the court

finds that the United States has complied with the provisions of the order.

The BOP has since the initiation of this lawsuit completed all construction that is located in the hundred-year flood plain at the FMC.[15] The actual construction on the flood plain is minimal: a one lane road, a double fence, low density lights. No actual buildings are located on the flood plain.[16]

E.O. 11988 expressly permits the location of such improvements in a flood plain if this is the only practicable alternative, potential harm is minimized, and notice is given as to why the action is proposed. E.O. 11988 § 2(a)(2). Here, notice was given as to why the FMC is needed and why the minimal alteration to the flood plain is necessary. The BOP has complied with the spirit of E.O. 11988. There is no showing that any of the harms E.O. 11988 was intended to prevent will result from the construction, and no practicable alternative exists for the location of these improvements. *See Cape May Greene, Inc. v. Warren,* 698 F.2d 179 (3rd Cir.1983).

■ The plaintiffs assert in counts three and four that the BOP has failed to cooperate with city and local officials and take into account local zoning and land use, all in violation of the Intergovernmental Cooperation Act, 31 U.S.C. § 6506 and the regulations promulgated thereunder and 40 U.S.C. §§ 531, 533. The plaintiffs rely on the affidavit of Richard Postier, a member of the Rochester Common Council. Postier states that to his knowledge no city official was contacted by a representative of the BOP at any time to discuss its plans for acquiring the Rochester site and locating the FMC on it. Affidavit of Richard Postier ¶ 3. The undisputed record shows, however, that the Common Council and other city, local, and state governmental bodies were supplied copies of both the draft statement and the final statement and sub-

---

**14.** 5 U.S.C. § 706 states in part:
The reviewing court shall—
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**15.** *See* Affidavit of J.D. Swinson, Jr., ¶ f.

**16.** *Id.* ¶¶ a–e.

mitted extensive comments. *Id.* ¶ 4; Affidavit of Thomas Moore ¶ 2. Furthermore, the record shows that the BOP made extensive efforts to inform local officials of its proposal, held public hearings and that in fact, knowledge of the proposal was widespread and the subject of extensive discussion.[17] *See* Affidavit of Chuck Hazama ¶ 5–7; Affidavit of Peter H. Solinger ¶ 7. Thus the extensive contacts make this case easily distinguishable from *City of Rochester v. United States Postal Serv.*, 541 F.2d 967 (2d Cir.1976), relied on by the plaintiffs. The BOP's actions also satisfy any duty to comply with and conform to local zoning and land use practices to the extent practicable because the renewed use of the site was to be similar to the preexisting use for which a zoning exception existed and no other practicable alternative existed.

■ The plaintiffs' attempt to fashion a claim in count five of the complaint that the BOP and Olmsted County wrongfully interfered with plaintiffs' rights of meaningful access to the courts, thus depriving them of various constitutional rights. The plaintiffs throughout the administrative process have been aware of their potential claims and the very fact that this action is before the court belies any claim that they have been denied meaningful access to the courts.

■ The declaratory judgment—quiet title claim brought in count six of the complaint is similarly without merit.[18] The operative language of the quit claim deed is that:

> [The County] may, at nominal cost, convey real property to other governmental entities or nonprofit organizations. [The County] agrees that any other conveyance of the above-described real property will be sold at public auction or advertised and sold by sealed bid to achieve maximum market value.

The plaintiffs assert that the conveyance of the site to the BOP for $14 million violates this provision. Any reasonable interpretation of the deed calls for a rejection of the plaintiffs' argument that the property could be sold to a government entity for $1, but not for $14 million, however. The permissive language allowing the sale at nominal cost does not preclude a sale to a governmental entity for more than that amount. The restrictions of a public auction or sealed bid are invoked only if the sale is to someone other than a governmental entity or nonprofit organization.

The claim is suspect on two additional grounds. The plaintiffs have no standing to bring this claim because they have no ownership interest in the property. Also, the claim may be moot because even if the conveyance violated the conditions of the original quitclaim deed, the state has not exercised its right created under the deed and is willing to execute the necessary instruments to release any such condition from the original quitclaim deed. *See* Affidavit of James Hiniker, Jr.

Plaintiffs also attempt to bootstrap their other claims into count six as a basis for declaring the federal government's title to the property void. These claims have all been rejected, and a discussion on whether voiding title would be an appropriate remedy for their violation is not necessary.

*Conclusion*

In sum, the court finds there is no genuine issue of material fact and that defendants are entitled to judgment as a matter of law on all of the counts in the complaint.

### ORDER

Accordingly, based upon the above and all the files, records, and proceedings herein,

---

**17.** It is also questionable whether any private right of action exists under the regulations promulgated under the Intergovernmental Immunities Act. 28 C.F.R. 30.1(C) (1983) states: "[t]hese regulations are intended to aid the internal management of the Department, and are not intended to create any right or benefit enforceable at law by a party against the Department or its officers."

**18.** Both parties agree that this claim involves a legal interpretation of the conveying instrument and is ripe for decision on summary judgment.

IT IS HEREBY ORDERED that defendants' motions for summary judgment are granted, and the complaint is dismissed in its entirety with prejudice.